PEOPLE *v.* YOUNG.

1. CRIMINAL LAW—DISCRETION OF COURT—WITNESSES—QUESTIONING BY COURT.
   The latitude of discretion possessed by a trial judge in a trial of one accused of crime encompasses the right to question a witness for the purpose of shedding light on something unclear in the testimony but does not permit the court to make his own views on disputed issues of fact become apparent to the jury.

2. SAME—INSANITY—PSYCHIATRIST—QUESTIONING BY COURT.
   Colloquy between trial judge and psychiatrist who testified for defendant, who was charged with first-degree murder and had interposed defense of insanity at time offense was committed, that was such as to make it apparent to jury that the testimony of such witness was not believed by the trial judge *held*, error requiring a new trial, since it may have prejudiced the result.

Appeal from Calhoun; Hatch (Blaine W.), J. Submitted October 12, 1961. (Docket No. 93, Calendar No. 48,797.) Decided November 30, 1961.

Cecil Young was convicted of murder in the first degree. Reversed and remanded for new trial.

*Paul L. Adams,* Attorney General, *Joseph B. Bilitzke,* Solicitor General, *Noble O. Moore,* Prosecuting Attorney, for the people.

*James R. Golden,* for defendant.

REFERENCES FOR POINTS IN HEADNOTES
[1, 2] 20 Am Jur, Evidence § 1207.
58 Am Jur, Witnesses § 553.
Propriety of conduct of trial judge in propounding questions to witnesses in criminal cases. 84 ALR 1172.

Edwards, J.   On February 20, 1952, Ida Bell Harris, former wife of defendant-appellant, Cecil Young, was killed in her apartment by knife wounds, one of which severed the jugular vein.   Defendant-appellant was charged with her murder.

After examination, a sanity commission was appointed.   On hearing its report, a Calhoun county circuit judge found Young to be "so insane that he is incapable of understanding the nature and object of the proceedings against him," and committed him to the Ionia State hospital for the criminally insane "until restored to his right mind."   See CL 1948, § 767.27 (Stat Ann 1954 Rev § 28.967).

Six years later, on November 6, 1958, the medical superintendent of the Ionia State hospital certified to the circuit court of Calhoun county that appellant was restored to sanity and able to understand the nature of the proceedings against him.   Thereupon he was returned to the Calhoun county jail to be tried on the original charge of murder.

Prior to trial his counsel filed notice of defense claiming that Young was "insane at the time of the alleged commission of the offense."

At the trial this defense was the only contested issue.   The prosecution witnesses established the knifing of the deceased by defendant and testified to defendant's subsequent admissions of the killing. This testimony was disputed only as to the coherence and detail of defendant's admissions. . The prosecution also presented a psychiatrist as a rebuttal witness on the issue of insanity.   This witness, Dr. Meister, testified to interviewing defendant twice shortly after his arrest and gave as his opinion that Young was sane at the time the crime was committed.

Dr. John G. Haarer testified for the defense.   Dr. Haarer was identified as a psychiatrist who had been medical superintendent of Ionia State hospital dur-

ing a portion of defendant's stay there. He gave as his opinion that defendant had been suffering from a mental disease called catatonic schizophrenia at the time of the commission of the crime. He also testified that defendant was "so insane, legally insane, that he could not differentiate right from wrong."

Aside from the testimony of these 2 expert witnesses, whose opinions were in direct conflict, the only testimony relating directly to the mental illness question concerned defendant's section 8 discharge from the army. The army medical records were admitted in evidence by stipulation. These indicated that during overseas service in 1943 defendant had had hallucinations which had led to a diagnosis of psychosis, and to his return to the States and discharge. These records also indicated that army tests had shown defendant had a mentality of 8 years.

The case was submitted to a jury with a charge which properly posed the issue of insanity. The jury returned a verdict of guilty of murder in the first degree, and the trial judge denied a motion for a new trial and sentenced defendant to life imprisonment.

On appeal, the only issue before this Court is defendant-appellant's contention that the circuit judge committed prejudicial error in his cross-examination of defendant's medical witness.

The colloquy complained of followed Dr. Haarer's direct examination, and his cross-examination by the prosecuting attorney. It ran as follows:

"*The Court:* I would like to ask 1 question, doctor. Of course, I am a layman, I don't understand these terms, but at the time he was brought up there to Ionia you examined him and at that time you based your finding largely on his past history?

"*A.* No, not exactly, because when Cecil came to the hospital he was still hallucinating, he could hear voices.

"*The Court:* But you took into consideration his past history, didn't you?

"*A.* One must always take into consideration the past history in making any type of diagnosis.

"*The Court:* Were you the one that sat on his case at the time you said he recovered his psychosis?

"*A.* No. Now, just a minute—

"*The Court:* When he was released from Ionia?

"*A.* Yes, I made that recommendation along with the rest of the staff.

"*The Court:* And didn't all of this history still exist of what had happened in the past, at that time?

"*A.* That is true.

"*The Court:* How do you psychiatrists square that with the idea that you use that you say that he is insane 1 time, and then you pass upon the same facts a year or so, or a few years later, and those same facts are there, and still you say he has recovered?

"*A.* Well, I made the statement to the court that he had recovered because we had observed him from 1952, December, until November of 1958, some 6 years, and during that period of time you could see that Cecil had gradually resolved his mental conflicts and had been functioning for a good many years what I would say was in the range of normalcy.

"*The Court:* Well, he testified here this morning that he couldn't remember anything of the facts that happened at the time of this offense that is alleged to have occurred, and these are the same facts he testified to you at the time he came up there.

"*A.* I bore that out in this description of schizophrenia, that no matter how well the schizophrenic, the catatonic schizophrenic, recovers he never will have sufficient insight into that episode. You can get catatonics that recover 100%, and they still don't realize that they have gone through a schizophrenic break. That is characteristic of this type of schizophrenia, and more or less substantiates the diagnosis in my mind.

"*The Court:*   I guess I just don't understand how you can use the same facts and say that he has recovered and he isn't any longer insane.

"*A.*   We are not basing everything on the fact that he didn't remember.

"*The Court:*   I know, but you were basing it on the history and largely on the history he had in the army, you will admit that, that you took that history into consideration?

"*A.*   Yes, I took that history into consideration, and also that he was still hallucinating.

"*The Court:*   And also that he was charged down here with a crime and had been committed up there by a psychiatrist?

"*A.*   Yes.

"*The Court:*   And those things still exist, don't they?

"*A.*   That is true.

"*The Court:*   And still you say that he has recovered, and he is now all right?

"*A.*   Yes, I say that in all honesty, because I have observed him for 6 years at the hospital, almost daily observation of Cecil."

This Court has frequently recognized the latitude of discretion possessed by a trial judge in the conduct of a trial.   It certainly encompasses a right to question a witness for the purpose of shedding light on something unclear in the testimony.   *People* v. *Fedderson,* 327 Mich 213; *People* v. *Salem,* 224 Mich 114. But these same cases (which appellee cites and relies on here) recognize that the court should not permit his own views on disputed issues of fact to become apparent to the jury.

This Court has not hesitated to reverse for new trial when the trial judge's questions or comments were such as to place his great influence on one side or the other in relation to issues which our law leaves to jury verdict.   *Wheeler* v. *Wallace,* 53 Mich 355; *McDuff* v. *The Detroit Evening Journal Company,*

84 Mich 1 (22 Am St Rep 673) ; *People* v. *Bigge,* 297
Mich 58; *People* v. *Cole,* 349 Mich 175.

In the first of these cases, Justice Cooley's opinion said (p 357) :

"It is very unusual to have exception taken on
writ of error to the manner and deportment of the
trial judge in the conduct of the .trial, and under ordinary circumstances a court of review would not
scrutinize very closely his methods when no error in
his rulings was ·alleged.   Still, it is possible for ·a
.judge to deprive a party of a fair trial, even without
intending to do so, by the manner in which he con-
·ducts the case, and by a plain exhibition to the jury
·of his own opinions in respect to the parties, or to
their case; and when it is apparent that a fair trial
has not been had, a court of review should give relief
.as soon for that cause as for any other."

We cannot avoid the conviction that the circuit
judge allowed his disbelief of the testimony of Dr.
Haarer to become entirely apparent to the jury.
Nothing in this record demonstrates obvious falsity
in Dr. Haarer's evidence.   We are forced to conclude
that the colloquy we have quoted invaded the prov-
ince of the jury on the crucial issue which was theirs
to decide.   This was error which may have preju-
diced the result.

Reversed and remanded for new trial.

Dethmers, C. J., and Carr, Kelly, Black, Kava-
nagh, Souris, and Otis M. Smith, JJ., concurred.