IN THE MATTER OF MIKESELL

Docket No. 55446. Argued November 5, 1975 (Calendar No. 1).—
    Decided May 27, 1976. Rehearing denied 397 Mich 956.

The Judicial Tenure Commission recommended the removal from
    office of the Honorable Willard L. Mikesell, a Judge of the Fifth
    Judicial Circuit. The respondent petitioned the Supreme Court
    to modify or reject the recommendation. *Held:*

1. Proceedings for removal of a judge are not quasi-penal in
    nature, because they concern maintaining the standards of
    judicial fitness rather than punishment for criminality. The
    combined investigatory and disciplinary role of the Judicial
    Tenure Commission does not violate the respondent's rights to
    due process of law. The fact that the same agency makes the
    initial charge and the ultimate adjudication on the same issues
    does not, without more, result in a violation of procedural due
    process.

2. Limitation of discovery and production of certain materials
    by the Master appointed by the Judicial Tenure Commission,
    following an *in camera* inspection of all the materials requested
    by the respondent, did not violate the respondent's rights. The
    confidentiality provisions of the rules of the Judicial Tenure
    Commission protect witnesses and citizens bringing a complaint
    as well as the accused judge. If a respondent were allowed to
    discover the name of every complainant, *including those who*
    will not appear before the commission and those whose com-
    plaints have been dismissed, the free flow of information to the
    commission would be curtailed. The commission investigates all
    complaints and citizens should not be discouraged from voicing
    their ideas.

3. The *only applicable meaning of* "habitual intemperance"
    as used in the Constitution (art 6, § 30) and "habitually intem-
    perate" as used in the court rule is the abuse of alcohol. The
    respondent was not charged with the abuse of alcohol. The
    finding by the Judicial Tenure Commission of "habitual intem-

REFERENCE FOR POINTS IN HEADNOTES
[1–6] 46 Am Jur 2d, Judges §§ 13–20, 79.

perance", in a different sense, is not adopted by the Supreme Court.

4. The record discloses an adequate factual basis to support the finding of an emerging pattern of hostile conduct toward counsel, the prosecuting attorney and his assistants, and defendants and witnesses. However, the proofs are inadequate to sustain charges that the respondent has shown contempt for appellate courts and has refused to approve appointment and payment of counsel for indigent defendants in certain criminal cases.

5. The evidence indicates that respondent is lacking in judicial temperament, but his integrity is beyond reproach and he is industrious in the work of the law. Because of his integrity and industry, the Supreme Court rejects the recommendation of removal from office. Respondent is suspended from office for one and one-half years without pay. Despite his suspension from judicial office, the respondent shall, if otherwise qualified, be permitted to practice law in the State of Michigan.

1. COURTS—JUDGES—DISCIPLINE.

The Supreme Court takes action against a judge charged with misconduct on the recommendation of the Judicial Tenure Commission and does not consider allegations in the complaint of misconduct which were not proven or included in the recommendation (Const 1963, art 6, § 30[2]).

2. COURTS—JUDICIAL TENURE COMMISSION—DUE PROCESS.

Proceedings before the Judicial Tenure Commission are not quasi-penal in nature because they concern maintaining standards of judicial fitness rather than punishing criminal conduct; the Supreme Court may exclude from the judiciary a person whose unfitness bears a rational relationship to his qualification for a judgeship so long as the adjudication of unfitness conforms to the minimum standards of due process.

3. COURTS—JUDICIAL TENURE COMMISSION—DUE PROCESS.

The combination of investigatory and disciplinary functions in the Judicial Tenure Commission does not violate the right of a judge charged with misconduct to due process of law.

4. COURTS—JUDICIAL TENURE COMMISSION—DISCOVERY—CONFIDENTIALITY.

Limitation of discovery and production of certain materials by a master appointed by the Judicial Tenure Commission following an *in camera* inspection of the materials requested by the respondent judge did not violate the respondent's right to due

process where the limitation protected the confidentiality of the identity of some persons making complaints against the respondent including those who did not appear before the commission and those whose complaints were dismissed before discovery was requested (GCR 1963, 932.22).

5. COURTS—JUDGES—HABITUAL INTEMPERANCE.

Abuse of alcohol is the only applicable meaning of the terms "habitual intemperance" as used in the Constitution and "habitually intemperate" as used in the court rule concerning discipline of judges by the Supreme Court (Const 1963, art 6, § 30[2], GCR 1963, 932.4).

6. COURTS—JUDGES—MISCONDUCT—EVIDENCE.

Conduct unbecoming a member of the judiciary may be proved by evidence of specific major incidents or by evidence of an accumulation of events which, when considered together, emerge as a pattern of hostile conduct unbecoming a member of the judiciary.

*Brian J. McMahon,* Executive Director and General Counsel, and *Daniel J. Henry, Jr.,* Special Examiner, for the Judicial Tenure Commission.

*John L. Collins* and *Leo A. Farhat* for respondent.

PER CURIAM. The Judicial Tenure Commission[1]

[1] Const 1963, art 6, § 30, which established the Judicial Tenure Commission in 1968, provides:

"(1) A judicial tenure commission is established consisting of nine persons selected for three-year terms as follows: Four members shall be judges elected by the judges of the courts in which they serve; one shall be a court of appeals judge, one a circuit judge, one a probate judge and one a judge of a court of limited jurisdiction. Three shall be members of the state bar who shall be elected by the members of the state bar of whom one shall be a judge and two shall not be judges. Two shall be appointed by the governor; the members appointed by the governor shall not be judges, retired judges or members of the state bar. Terms shall be staggered as provided by rule of the supreme court. Vacancies shall be filled by the appointing power.

"(2) On recommendation of the judicial tenure commission, the supreme court may censure, suspend with or without salary, retire or remove a judge for conviction of a felony, physical or mental disability which prevents the performance of judicial duties, misconduct in office, persistent failure to perform his duties, habitual intemperance

(hereinafter the Commission) has recommended the removal from office of the Honorable Willard L. Mikesell, 5th Judicial Circuit Judge. Pursuant to GCR 1963, 932.24, the respondent petitioned this Court to modify or reject the Commission's recommendation. We have reviewed the record *de novo*.[2] We deny the Commission's recommendation that Judge Mikesell be removed from office, but we conclude that he should be suspended from office for a period of one and one-half years without pay.[3]

## ISSUES

   I.   What are the limitations of this Court's review in Judicial Tenure Commission cases?

   II.   Are Judicial Tenure Commission proceedings quasi-criminal in nature?

   III.   Does the constitutional amendment creating the Michigan Judicial Tenure Commission violate the Federal and state constitutional mandates requiring a separation of powers, fair hearing and due process of law?

   IV.   Did the limitation of discovery imposed by the Master, following an *in camera* inspection of all materials, violate the respondent's constitutional rights?

---

or conduct that is clearly prejudicial to the administration of justice. The supreme court shall make rules implementing this section and providing for confidentiality and privilege of proceedings."

[2] *In re Somers,* 384 Mich 320, 323; 182 NW2d 341 (1971).

[3] While the evidence indicates that respondent is lacking in judicial temperament, his personal integrity is beyond reproach. Despite his suspension from judicial office, respondent shall if otherwise qualified be permitted to practice law in the State of Michigan.

V.  Did the Master comply with GCR 1963, 932.15 which requires him to make "findings of fact and conclusions of law"?

VI.  What is the meaning of "habitually intemperate" as used in 1963 Const, art 6, § 30(2), and GCR 1963, 932.4?

VII.  Does a *de novo* review of the record support the Judicial Tenure Commission recommendation?

HISTORICAL SUMMARY

After admission to the bar in 1953, respondent served as an assistant attorney general, as the Eaton County prosecuting attorney and engaged in the private practice of law. Respondent was elected to the circuit bench and assumed office on January 1, 1971.

The Commission filed a formal complaint against respondent on October 23, 1973. On November 28, 1973 the respondent filed a written answer to the formal complaint. On December 6, 1973, this Court appointed the Honorable Stewart A. Newblatt as the Master.[4] Prehearing conferences were held on January 8, 1974 and February 18, 1974. On February 28, 1974, respondent filed a motion with the Master seeking discovery of certain files, records, documents and writings in possession of the Commission.[5]

---

[4] GCR 1963, 932.10.

[5] Respondent's motion sought production of any record of the Commission ordering the inquiry and preliminary examination, any request of the Chief Justice for a preliminary examination, any communication furnished to the Supreme Court Administrator, and any statements in any form obtained from any person whether or not such person was to be a witness in this cause.

Following a hearing on March 11, 1974, the Master denied the motion. On March 12, 1974, respondent was granted a subpoena *duces tecum* from the Ingham Circuit Court.[6] The Commission filed an emergency motion to quash subpoena *duces tecum* on March 14, 1974 which was denied on March 18, 1974.

On March 18, 1974 Commission Chairman, the Honorable John H. Gillis, appeared before the Master, without waiving any procedural rights, and brought in sealed containers all of the files and records specified in the subpoena. The Master ruled that the files and records would be examined by him *in camera.* Any portion deemed to be relevant or material to the issues stated in the complaint or to the hearing being conducted would be made available to the respondent. The Master stayed enforcement of his ruling to allow the Commission's counsel to seek review of his decision in this Court. On March 18, 1974 the Commission's counsel filed an emergency petition for superintending control from this Court.

In an April 9, 1974 order, we granted the Commission's petition for superintending control. We ordered that the subpoena *duces tecum* be vacated. The Commission's prayer to reverse, vacate, and quash the ruling and orders of the Master was denied without prejudice to subsequent review upon application to this Court by either party.[7]

[6] The subpoena *duces tecum* ordered the Commission chairman to produce and testify before Master Newblatt on March 18, 1974 respecting all records and documents of like tenor and scope so previously requested of Master Newblatt.

[7] The April 9, 1974 order provided:

"On order of the Court, the emergency petition by the Michigan Judicial Tenure Commission for superintending control is considered, and the same is hereby GRANTED.

"It is further ordered, that the subpoena duces tecum heretofore issued in the cause of the Matter of Willard L. Mikesell is hereby vacated. Circuit Court jurisdiction is limited solely to the ministerial

On April 17 and 18, 1974, the Master held an *in camera* inspection of all materials. Certain items were ordered delivered to respondent. Respondent did not further petition this Court for review of the Master's discovery rulings until the instant petition.

There were 21 days of hearings before the Master[8] with a concluding date of July 24, 1974. The Master's report was filed with the Commission on February 3, 1975. On April 10, 1975 both parties filed objections to the Master's report.[9]

On May 20, 1975, the Commission filed its decision with this Court[10] concurring with the Master's finding and recommending removal.[11] On July 7, 1975 the respondent petitioned[12] this Court to reject the Commission's recommendation, for preliminary relief as to discovery, for stay of proceedings, and for a motion to extend time. On August 1, 1975 the Commission filed a brief in opposition to the respondent's petition.

---

act of issuance of a subpoena. If any party in interest is dissatisfied with the grant or denial of the petition for a subpoena, the dissatisfied party may petition directly to the Supreme Court for an order of superintending control.

"It is further Ordered that the petitioner's prayer to reverse, vacate and quash the ruling and orders of the Honorable Stewart A. Newblatt, appointed Master in the 'Matter of the Michigan Judicial Tenure Commission Formal Complaint No. 10, is hereby denied without prejudice to subsequent review upon application to this Court by either party after determination by the Master as to what materials Judge Mikesell is entitled to receive."

[8] The hearing commenced on March 11, 1974 at the State Bar Building and sessions of the hearing were held on the following days: March 12, 13, 15, 18, 19, 20, 21, 22; April 1, 2, 5, 17, 30; May 1, 2, 31; June 16, 20; July 13, 16, 24.

[9] Pursuant to GCR 1963, 932.16 and 932.17.

[10] GCR 1963, 932.23.

[11] There were two dissenting votes. Both dissenters concurred with the ultimate conclusion that respondent was guilty of judicial misconduct in office but they differed with the recommendation of removal from office. One dissenter recommended a 60-day suspension without pay with this Court retaining jurisdiction for two years. The other dissenter recommended a public reprimand by this Court.

[12] GCR 1963, 932.24.

On August 27, 1975, we issued an order denying without prejudice respondent's petition for preliminary relief as to discovery. Respondent's petition for preliminary relief as to findings of fact was also denied. Respondent's petition for stay of proceedings was declared moot and denied.

We granted respondent's request with a 30-day extension of time. The case was added to the November, 1975 session on this Court's own motion.

The Michigan Constitution contemplates "individualized determinations by the Tenure Commission and this Court based on the entire factual context."[13] Thus, we must look to all the circumstances in our determination.

## I

· Under Const 1963, art 6, § 30(2), this Court may take action against a judge "[o]n the recommendation of the judicial tenure commission". Thus, while the original complaint filed against the respondent contained 14 paragraphs of which 12 were allegations of misconduct, this Court concerns itself only with paragraphs 9–14 of the complaint.[14] The Commission adopted and confirmed

---

[13] *In re Kapcia,* 389 Mich 306, 311, 312; 205 NW2d 436 (1973).

[14] "9. The Respondent has, both in private conversations and public pronouncements, by his judicial conduct, demonstrated his disrespect and contempt for the appellate courts of the State of Michigan and the judges thereof, and has stated his intention to disobey the lawful orders thereof, and the law as established by the decisions thereof, contrary to law and in violation of the Canons of Judicial Ethics, and particularly Canons 3, 5, 8 and 20 thereof.

"10. In the conduct of criminal cases before his court the Respondent has refused to approve and allow appointed counsel for indigent defendants, and has refused to authorize and allow payment of proper attorney fees and lawful expenses of indigent defendants and their appointed counsel, including, but not limited to the following cases: *People v Jerry Curtis,* Eaton County Circuit Court, No. 11-72-C; *People v Jack Harman,* Eaton County Circuit Court No. 182-72-C;

the report of the Master in all respects. The Mas-

*People v Gary Joe Viane,* Eaton County Circuit Court, No. 82-72-C; *People v Charles Chattman,* Eaton County Circuit Court No. 80-71-C.

"11. In the conduct of his court the Respondent has repeatedly and persistently subjected counsel appearing before him to discourtesy, harrassment, unjust criticism and abuse, in violation of the Canons and Judicial Ethics and particularly Canon 10 thereof. Such conduct is illustrated by, but not limited to, the following cases: *People v Walter Farr,* Eaton County Circuit Court No. 136-71-C; *People v Gerald Phifer,* Eaton County Circuit Court No. 85-72-C; *People v Richard Kreis,* Eaton County Circuit Court No. 87-72-C; *People v Robert C Lumbert,* Eaton County Circuit Court No. 86-72-C; *People v Jerry Curtis,* Eaton County Circuit Court No. 11-72-C; *People v Michael Dickinson,* Eaton County Circuit Court No. 34-72-C; *People v Danny Turner,* Eaton County Circuit Court No. 127-71-C.

"12. The Respondent has persistently employed his judicial power to attempt to coerce and control the Prosecuting Attorney of Eaton County in lawful performance of the duties of his office, and has persistently interfered and harrassed him therein. The Respondent has usurped the constitutional and lawful powers of the said Prosecuting Attorney, and in disregard of the impartiality required of his judicial office, has attempted to manipulate the administration of justice by exerting control over the said Prosecuting Attorney in the exercise of his executive discretion and performance of his duties. The Respondent has issued orders of purported superintending control against the said Prosecuting Attorney, and has enforced his unlawful orders against him by use of the contempt powers of his judicial office, the incarceration of members of his official staff, and the issuance of a warrant for his personal arrest, from which he was restrained and deterred only by the direct order of the Michigan Court of Appeals. Such conduct is illustrated by, but not limited to, the following cases: *People v Paul Floyd Baker,* Eaton County Circuit Court No. 2-71-C; *People v Danny Turner,* Eaton County Circuit Court No. 127-71-C; *People v Jerry Curtis,* Eaton County Circuit Court No. 11-72-C; *People v Walter Farr,* Eaton County Circuit Court No. 136-71-C; *People v Terry Withrow,* Eaton County District Court.

"13. In the conduct of criminal cases in his court, the Respondent has persistently ignored and violated the requirements of objective impartiality inherent in his judicial office, and has persistently interfered and intervened in the trial of cases, usurping the lawful function and responsibility of both prosecution and defense counsel in the conduct of said cases, and the presentation of evidence and testimony therein; and has assumed a position of advocacy and interrogated witnesses and litigants in a severe and adversary manner and tone, notwithstanding the objections of both prosecution and defense counsel, and has thereby abandoned his judicial responsibility and impartiality to participate in the active trial of such cases, contrary to law, and in violation of the Canons of Judicial Ethics, and particularly Canons 15, 5, 9 and 10 thereof. Such conduct is illustrated by, but not limited to, the following cases: *People v Danny Turner,* Eaton County Circuit Court No. 127-71-C; *People v Walter Farr,* Eaton County

ter found that the allegations of paragraphs 3–8 of the complaint were not proven. They are not part of the recommendation of the Commission and will not be considered by this Court.

This conclusion was also reached by the California Supreme Court in considering a similar situation in *Spruance v Commission on Judicial Qualifications,* 13 Cal 3d 778, fn 5; 119 Cal Rptr 841; 532 P2d 1209 (1975). In *Spruance* the California Court held:

"Among the arguments addressed to the court in this case is one of first impression which we feel should be answered directly. The examiners have argued that the dismissal by the Commission of certain of the specifications of misconduct by petitioner should not necessarily be accorded conclusive effect. The examiners contend that two of the dismissed specifications (counts I-G and I-I) were proven by clear and convincing evidence and constitute conduct for which the Constitution authorizes the imposition of discipline (see *Geiler v Commission on Judicial Qualifications, supra,* 10 Cal 3d at pp 283–284, 110 Cal Rptr 201, 515 P2d 1) notwithstanding the fact that the Commission, in stating that the specifications were 'not sustained,' chose not to issue any

Circuit Court No. 136-71-C; *People v Michael Dickinson,* Eaton County Circuit Court No. 34-72-C; *People v Richard Morris,* Eaton County Circuit Court No. 112-71-C; *People v Bernard L Woodmansee,* Barry County Circuit Court No. 72-614; *People v Ronald H Foster,* Barry County Circuit Court No. 73-674.

"14. In the case of *People v Ronald H Foster,* Barry County Circuit Court No. 73-674, the Respondent set bond on arraignment of the defendant before his court in the amount of $10,000.00. Subsequently, the Respondent denied defendant's motion for reduction of the bond, and then advised the said defendant that if he would have his hair cut exactly to the length and style of the Respondent's own, the same being approximately one-quarter inch in length over the entire head, the Respondent would grant a reduction in the bond to $500.00. The Respondent set no other condition for the granting of such reduction in bond. The defendant subsequently had his hair cut in accordance with the Respondent's stated requirements, and was released by Respondent's order upon the posting of $500.00 bond. The Respondent's conduct aforesaid is contrary to law and in violation of the Canons of Judicial Ethics, and particularly Canon 21 thereof."

findings of fact and conclusions of law. The examiners maintain that because we have undertaken to review the record ourselves and to adopt our own findings of fact and conclusions of law, it is within our power to find proven any of the charges lodged against petitioner upon which evidence was received regardless of the Commission's disposition of such charges. We emphatically disagree.

"The Constitution clearly makes our power to discipline a judge for misconduct 'contingent on the Commission having so recommended'. *(Geiler v Commission on Judicial Qualifications, supra,* 10 Cal 3d at p 276, 110 Cal Rptr, at p 204, 515 P2d at p 4; Cal Const, art VI, § 18, subd (3) [see fn 1, supra].) *It would be entirely inconsistent with this constitutional division of functions for us to consider in passing on the Commission's recommendation any allegations of prejudicial conduct or wilful misconduct other than those which formed the basis of that recommendation."* (Emphasis added.)

## II

The respondent maintains that the proceedings for removal are quasi penal in nature. Such is not the case. It is important to characterize properly the proceedings herein because we are concerned not with punishing criminality but with maintaining standards of judicial fitness.

In a leading case,[15] *Geiler v Commission on Judicial Qualifications,* 10 Cal 3d 270, 281; 110 Cal Rptr 201; 515 P2d 1 (1973), the California Supreme Court stated that:

"The ultimate standard for judicial conduct must be conduct which constantly reaffirms fitness for the high responsibilities of judicial office. It is immaterial that the conduct concerned was probably lawful, albeit unju-

[15] *Geiler* was the first instance in which the California Supreme Court removed a judge from office. 515 P2d 1, at fn 13.

dicial, or that petitioner may have perceived his offensive and harassing conduct as low-humored horseplay."

In *Keiser v Bell,* 332 F Supp 608 (ED Pa, 1971), the United States District Court considered allegations of denial of procedural due process in judicial removal proceedings before the judicial removal board and the Supreme Court of Pennsylvania found:

"The proceedings of the Judicial Board are investigatory and advisory and are not binding upon the Supreme Court. No determination of criminal guilt is made, but merely a determination of the Judicial Board's view of the conformity of the subject of investigation to the state constitutional standards for judicial office. *Similarly, the resulting Order of the Supreme Court does not operate as a sanction for criminal guilt but as a judgment on judicial fitness.* At most, the proceedings of the Judicial Board could be characterized as quasi-judicial administrative hearings, and the Order of the Supreme Court as a judicial disciplinary order. See, *e.g., Kane v Rudich,* 256 App Div 586; 10 NYS2d 929 (2d Dept, 1939) (an action to remove magistrate for cause, rules governing testimony in criminal cases do not apply); *Sharpe v State ex rel Oklahoma Bar Ass'n,* 448 P2d 301 (Okla Jud, 1968), *cert den* 394 US 904; 89 S Ct 1011; 22 L Ed 2d 216 [1969] (removal from judicial office and disqualification from other public office not a criminal proceeding and right to jury trial does not obtain)." (Footnote omitted and emphasis supplied.) 332 F Supp 608, 616–617.

This issue was also discussed by the Florida Supreme Court in *In re Kelly,* 238 So 2d 565, 569 (Fla, 1970) wherein they said:

"The proceeding before the Commission lacks the essential characteristics of a criminal prosecution. The object is not to inflict punishment, but to determine whether one who exercises judicial power is unfit to

hold a judgeship. The Commission, created by the Constitution as an arm of this Court, is authorized to conduct a hearing for the purpose of aiding this Court in determining whether a judge is unfit or unsuitable. Under the provisions of the Constitution this Court may exclude from the judiciary those persons whose unfitness or unsuitability bears a rational relationship to his qualifications for a judgeship, so long as the adjudication of unfitness rests on constitutionally permissible standards and emerges from a proceeding which conforms to the minimum standards of due process. In short, the essence of the sanction imposed is not 'punishment' but a reprimand based on grounds bearing rational relationship to the interest of the State in the fitness of its judicial personnel. See *Sharpe v State ex rel Oklahoma Bar Association,* 448 P2d 301 (Okl Jud, 1968), *cert den,* 394 US 904; 89 S Ct 1011; 22 L Ed 2d 216, where the Court discussed the applicability of the Sixth Amendment to the United States Constitution (Right to Jury Trial), in a proceeding before the trial division of the Court on the judiciary."

## III

Although candidly admitting that all authority is to the contrary, respondent contends that the combined investigatory and disciplinary role of the Commission violates the constitutional rights to due process.

This Court has recently spoken to this issue in *State Bar Grievance Administrator v Baun,* 395 Mich 28, 34–35; 232 NW2d 621 (1975), wherein the Court stated:

"Attorney Baun submits that he was denied a fair hearing before an impartial tribunal. He contends that in effect the State Bar Grievance Board requested the investigation, investigated, determined probable cause, charged, prosecuted, and then found appellant guilty. The Grievance Board maintains that the nexus between the State Bar Grievance Administrator, the hearing

panel and itself is sufficiently attenuated as to negate that contention. We agree with the Grievance Board.

"In a recent case which is dispositive of this issue, *Withrow v Larkin,* 421 US 35; 95 S Ct 1456; 43 L Ed 2d 712 (1975), involving the revocation of a medical license, the United States Supreme Court said:

" 'The initial charge or determination of probable cause and the ultimate adjudication have different bases and purposes. The fact that the same agency makes them in tandem and that they relate to the same issues does not result in a procedural due process violation.

\* \* \*

" 'That the combination of investigative and adjudicatory functions does not, without more, constitute a due process violation, does not, of course, preclude a court from determining from the special facts and circumstances present in the case before it that the risk of unfairness is intollerably high.'

"In the instant case, the State Bar Grievance Administrator found probable cause, prepared, filed and prosecuted the complaint. A hearing panel initially adjudicated the matter and then the State Bar Grievance Board reviewed it. The functions are separate. The people are different in each instance.

"*Withrow* is clear. Absent a contrary showing, the hearing panel, the Grievance Board and the Grievance Administrator, in addition to being functionally separate, are assumed to be fair and honest—composed of 'men of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances'. We have been presented with no special facts or circumstances which suggest that the risk of unfairness is 'intolerably high' or that it even minimally exists. We find no denials of due process."

Footnote 4 of *Baun* stated that:

"To the contrary, the most frequent complaint is that lawyers sitting in judgment upon lawyers are likely to be protective."

In the recently decided case of *In re Hanson,* 532
P2d 303, 306 (Alaska, 1975), the Supreme Court of
Alaska summarized:

"Regarding petitioner's contention, the Commission
points out that procedures similar to Alaska's are cur-
rently in effect in at least twenty-four states and the
District of Columbia. Research discloses that petition-
er's due process argument has been rejected by all
courts which have considered the question. *Keiser v
Bell,* 332 F Supp 608 (ED Pa, 1971); *In re Haggerty,* 257
La 1; 241 So 2d 469 (1970); *In re Kelly,* 238 So 2d 565
(Fla, 1970); *In re Diener & Broccolino,* 268 Md 659; 304
A2d 587 (1973). These courts have elected to adopt the
majority position as stated by Professor Davis in his
treatise on administrative law. According to Professor
Davis,

" 'State courts, like federal courts, generally hold,
with only occasional exceptions, that due process does
not forbid the combination with judging of such func-
tions as prosecuting, investigating, and accusing
* * * .' "[16] (Footnote omitted.)

We find no constitutional violation as alleged.

## IV

Respondent's arguments concerning the Master's
denial of the discovery and production of certain
additional materials must fall. As was summarized
in the factual presentation, the Master held an *in
camera* inspection of all materials and certain
materials were ordered delivered to respondent.
GCR 1963, 932.11 requires the Master to

---

[16] Footnote 9 at 532 P2d 306 lists the following states in accord with
Michigan:

"Alabama, Arizona, California, Colorado, Florida, Georgia, Idaho,
Indiana, Louisiana, Maryland, Michigan, Minnesota, Missouri, Mon-
tana, Nebraska, New Mexico, North Carolina, Oregon, Pennsylvania,
Tennessee, Texas, Utah, Wisconsin, and Wyoming. *See generally
American Judicature Society, Judicial Disability and Removal Com-
missions, Courts and Procedures* (G. Winters & R Lowe eds, 1973)."

" * * * proceed with a public hearing which as nearly as may be shall conform to the rules of procedure and evidence governing the trial of civil actions in the circuit courts, whether or not the respondent has filed an answer or appears at the hearing".

Additionally, the Master where one is appointed is charged with ruling on "all motions and other procedural matters incident to the complaint, answer and hearing".[17]

In the case of *In re Haggerty,* 241 So 2d 469, 475 (La 1970), the Supreme Court of Louisiana considered a similar question and opined:

"In a *motion* therefor, respondent *sought additional particulars* in numerous instances with general reference to the names and whereabouts of witnesses and the sources and nature of their evidence which the Commission intended to use. This application was without merit and was properly overruled. The Commission treated this motion as a plea of vagueness and overruled it as requesting evidentiary detail, and held that the factual allegations, except with relation to respondent's disability, were sufficiently specific to fairly inform the respondent of the charges against him and of the nature of the facts sought to be proved so as to enable him to prepare his defense. In this we agree and point out that in the case of *In re Novo,* 196 La 1072; 200 So 466, 467 (1941), proceedings of this nature, it was held the technical niceties required in suits between private parties where the court is called upon to adjudicate conflicting claims is not essential, and all that is required is that the charges against the respondent shall be so specific as to fairly inform him of the misconduct of which he is accused."

The California Supreme Court recently spoke to the question of discovery in the judicial removal case of *McCartney v Commission on Judicial Qual-*

---

[17] GCR 1963, 932.10(b).

*ifications,* 12 Cal 3d 512; 116 Cal Rptr 260; 526 P2d 268, 273 (1974):

"Nor does there appear to be any substantial merit in the assertions that petitioner was denied due process when the Commission, pursuant to its own special rule, limited discovery to items other than depositions. In requesting the opportunity to take depositions of witnesses (or, in the alternative, to serve written interrogatories) in addition to the discovery permitted by the Commission, petitioner sought the discovery expressly authorized by state (Gov Code, § 68753 empowering the Commission to order depositions '[in] any pending investigation or formal proceeding'). *As matters of discovery are generally within the sound discretion of the initial trier of fact, however, we consider that the determination as to whether a discovery order shall issue is within the sound discretion of the Commission."* (Emphasis added.)

The respondent contends that the filing of a written consent compels disclosure under GCR 1963, 932.22(c).[18] Disclosure is discretionary and we can

---

[18] ".22 Confidentiality and Privilege of Proceedings.

(a) Prior to the filing of a complaint, no member of the commission or its staff shall disclose the existence or contents of the investigation nor any testimony taken nor papers filed therein; provided, however, that the commission may at any time make public statements as to matters pending before it, only upon its determination by a majority vote that it is in the public interest to do so, limited to the following: (1) that there is an investigation pending, or (2) that the investigation is complete and that there is insufficient evidence for filing a complaint by the commission.

(b) After filing of complaint, all subsequent proceedings shall be available for public inspection and shall be conducted in open public hearings.

(c) Upon the written consent of the judge against whom complaint has been made or is being investigated, *the commission in its discretion may disclose matters relating thereto notwithstanding any prohibition against disclosure set forth in this rule.*

(d) Notwithstanding any prohibition against disclosure set forth in this rule, the commission may in its discretion refer to the Supreme Court administrator grievances and other communications received by the commission concerning the conduct of a judge, which in the opinion of the commission, are properly within the jurisdiction of the

find no abuse of the Master's discretion after having read the entire record.

While the policy of confidentiality protects the judge and might arguably be waived by him, the confidentiality provisions also protect witnesses and citizen complainants. If the respondent and others similarly situated were allowed to discover the name of every complainant, including those who will not appear and those whose complaints have been dismissed, the free flow of information to the Commission would be curtailed. The Commission carefully investigates all complaints and this Court would not want to discourage citizen complainants from voicing their ideas.

## V

GCR 1963, 932.15 requires that the Master's report contain his "findings of fact and conclusions of law with respect to the issues presented by the complaint and answer".

In addition to a 17-page report containing findings of fact and conclusions of law, the Master's report contains a 69-page testimonial summary of the over 3400 pages of transcript involved in the instant case. The allegations as to lack of findings of fact and conclusions of law are without merit.

## VI

In order to implement Const 1963, art 6, § 30(2),

court administrator; and may further disclose to the court administrator any files, records, investigations and reports of the commission relating thereto. Such referral to the court administrator shall not preclude action by the commission where the judge's conduct is of such a nature as to constitute grounds for action by the commission, or which cannot be adequately resolved or corrected by action of the court administrator." (Emphasis added.)

this Court promulgated GCR 1963, 932.4 which provides in pertinent part:

".4 Standards of Judicial Conduct.

\* \* \*

(b) A judge shall be deemed guilty of misconduct in office if:

\* \* \*

(iii) He is habitually intemperate within the meaning of Constitution of 1963, article 6, section 30.

(iv) His conduct is clearly prejudicial to the administration of justice.

\* \* \*

(d) Any conduct of a judge which is in violation of the canons of judicial ethics or the canons of ethics of the legal profession may be deemed evidence of misconduct by a judicial officer, but shall not be conclusive or determinative of whether a judge has been guilty of misconduct. Extenuating circumstances may be considered to support a finding of lack of judicial misconduct warranting disciplinary action."

At pp 11–12 of the Master's report, he stated:

"The Master finds that the Respondent's conduct as hereinbefore found, constitutes judicial misconduct in the office within the provisions of Article VI, Section 30 of the Michigan Constitution of 1963, as amended, and Rule 932.4 of the Michigan General Court Rules of 1963, as amended, in that such conduct is *habitually intemperate within the meaning* thereof, is violative of the Canons of Judicial Ethics, is prejudicial to the rights of parties and counsel before his court, is disruptive of the orderly, proper and effective procedure of the court, is demeaning to the dignity of judicial office, and is clearly prejudicial to the administration of justice." (Emphasis added.)

While "habitually intemperate" as stated in the court rule and "habitual intemperance" as stated

in the constitution are capable of being defined in several ways, the respondent contends that the only applicable meaning is the abuse of alcohol. We agree.

In the case of *In re Somers, supra,* this Court stated that respondent therein was charged with being "habitually intemperate by appearing in court under the influence of alcohol".

In regard to this charge, the Court admonished that:

"We note an increase in the number of complaints filed with respect to trial judges appearing in court after having consumed 'liquid refreshments'. Neither the Judicial Tenure Commission nor this Court can condone such practices. The public has a right to expect their judges to act in a more circumspect manner. One who assumes such a position must not only be, but like Caesar's wife must appear to be, above reproach."[19]

The respondent contends and we find that he has not been accused of the abuse of alcohol.

Therefore, the finding of "habitual intemperance" is not supported by the facts and is not adopted by this Court.

## VII

In arriving at the recommendation that respondent should be removed from office, the Commission's decision provided in pertinent part:

"In considering the allegations of violation of judicial ethics the Commission considered violations of the Canons of Judicial Ethics in effect at the time of the activities involved herein. These canons are the canons adopted by the Michigan Supreme Court on January 16, 1947, as amended, which have been subsequently super-

---

[19] 384 Mich 320, 323 (1971).

seded by the Code of Judicial Conduct which became effective October 1, 1974.

"After reviewing the full record herein, including numerous exhibits, and upon consideration of the arguments of counsel, it is the conclusion of the Judicial Tenure Commission that the Report of the Master is hereby adopted and confirmed in all respects. We do not propose to repeat the factual discussions contained in the Report of the Master. Suffice it to say that we agree with the basic conclusions of the Master, from which we quote the following:

" ' * * * the Master finds that the Respondent, in the conduct of his court, has repeatedly and persistently subjected counsel appearing before him to discourtesies, harrassment, unjust criticism and abuse, in violation of the Canons of Judicial Ethics and particularly Canon 10 thereof.' (p 9).

" ' * * * the Master finds that the Respondent has persistently employed his judicial power to attempt to coerce and control the Prosecuting Attorney of Eaton County in the lawful performance of the duties of his office and has persistently interfered and harrassed him therein. Further, the Master finds that the Respondent has usurped the constitutional and lawful powers of the said Prosecuting Attorney, and in disregard of the impartiality required of a judicial office, has attempted to manipulate the administration of justice by exerting control over the said Prosecuting Attorney in the exercise of his executive discretion and performance of his duties. The Master further finds that the Respondent has issued orders of purporting superintending control against the said Prosecuting Attorney, and has enforced his unlawful orders against him by use of the contempt powers of his judicial office, the incarceration of members of his official staff, from which he was restrained and deterred only by the intercession of judges of the Court of Appeals.' (p 10).

" ' * * * the Master finds that the Respondent, in the conduct of criminal cases in his court, has persistently ignored and violated the requirements of objective impartiality inherent in his judicial office, and has persistently interfered and intervened in the trial of cases, usurping the lawful functions and responsibility

of both prosecution and defense counsel in the conduct of said cases, and the presentation of evidence and testimony therein; and has assumed a position of advocacy and interrogated witnesses and litigants in a severe and adversary manner and tone, notwithstanding the objections of both prosecution and defense counsel, and has thereby abandoned his judicial responsibility and impartiality to participate in the active trial of such cases, contrary to law and in violation of the Canons of Judicial Ethics, particularly Canons 15, 5, 9 and 10 thereof.' (pp 10–11).

" '[T]he Master finds that the Respondent's conduct as hereinbefore found, constitutes judicial misconduct in the office within the provisions of Article VI, Section 30 of the Michigan Constitution of 1963, as amended, and Rule 932.4 of the Michigan General Court Rules of 1963, as amended, in that such conduct is habitually intemperate within the meaning thereof, is violative of the Canons of Judicial Ethics, is prejudicial to the rights of parties and counsel before his court, is disruptive of the orderly, proper and effective procedure of the court, is demeaning to the dignity of judicial office, and is clearly prejudicial to the administration of justice.' (pp 11–12).

"In the face of our foregoing conclusions, it is clear that the Respondent is grossly lacking in judicial temperament. We do not deem him to be lacking in integrity. We do believe, however, that he has an uncontrollable predilection to align himself with one or the other of the litigants which in criminal cases places him preponderantly in the role of prosecutor. He thereby destroys his objectivity and undermines the effectiveness of the judicial function. He is devoid of the basic concept of impartiality in the conduct of trials and in the decisions made by him in the course thereof. In the face of such a pre-eminent lack of judicial temperament, it is clear to us that he should not hold judicial office. It is therefore the recommendation of the Judicial Tenure Commission that the Honorable Willard L. Mikesell, Circuit Judge, Respondent herein, be removed from office."

In *Kelly, supra,* the Florida Supreme Court held:

"Conduct unbecoming a member of the judiciary may be proved by evidence of specific major incidents which indicate such conduct, or it may also be proved by evidence of an accumulation of small and ostensibly innocuous incidents which, when considered together, emerge as a pattern of hostile conduct unbecoming a member of the judiciary." 238 So 2d 565, 566.

Our *de novo* review of the entire record discloses an adequate factual basis to support a finding of an emerging pattern of hostile conduct as charged in paragraphs 11 through 14. However, we find the proofs inadequate to sustain the charges of paragraphs 9 and 10.

A former assistant prosecutor described an exchange that took place between the respondent and a defense attorney during the direct examination of a witness in *People v Walter Farr,* Eaton County Circuit Court No 136-71-C:

"*Q.* All right. Would you describe Judge Mikesell's demeanor during that exchange? Was he courteous?

"*A.* His tone of voice and his expressions, his demeanor towards Mr. Bean, were—conveyed to me his opinion that Mr. Bean should have known better than to do what he was doing and that he obviously wasn't qualified or he would have known this and it was again the teacher-student relationship I have referred to. Mr. Bean was—knew something less than what he should have known. The judge's tone of voice was sarcastic.

"*Q.* Was it antagonistic?

"*A.* I—I don't know what I can characterize it any better than to say it was sarcastic.

"*Q.* Was this in the presence of the jury?

"*A.* Yes, sir."

In the Master's testimonial summary he made the following findings as to an exchange that took place between the respondent and the prosecutor in *People v Curtis,* 42 Mich App 652; 202 NW2d

539 (1972), *rev'd in part, aff'd in part* 389 Mich 698; 209 NW2d 243 (1973):

"Respondent asked if Prosecutor Zimmer would like to be included within the order and Zimmer said that if the Court feels it necessary. Respondent said that he didn't expect Zimmer 'to attempt to control the jurisdiction of the court' to which Zimmer responded that he had a right to make a motion in any court in the State and that he didn't expect the Respondent to tell him that he could not do so and that if Zimmer was wrong, the court would tell him so. Respondent then said, 'That's what I'm telling you' and Zimmer responded, 'But not that I cannot make a motion'. Respondent then said, 'Will you shut your big mouth for just a moment, Mr. Zimmer! You're before the Court and you're an officer of this Court. I expect you to conduct yourself accordingly'. Respondent then told Zimmer that Zimmer had made every possible attempt for the past year to flaunt the jurisdiction of the Court. The dispute continued until Respondent remanded the Defendant to the custody of the Sheriff without bond pending filing of proper papers."

In describing the respondent's examination of the defendant in *People v Withrow,* Eaton County District Court, a former assistant prosecutor stated at the hearing:

"*Q.* Would you describe the manner of that questioning?
"*A.* Mr. Withrow was a man who I would characterize as a borderline intelligence, barely able to convey his feelings and the judge questioned him extensively, again, with the same probing, strong, antagonistic tone of voice.
"The witness, on the stand, appeared to me to totally lose his composure. When the examination by the judge was completed I don't think he knew for sure how to get off the witness chair. He just completely fell apart."

In *People v Dickinson,* the Court of Appeals in an unpublished per curiam opinion, released January 23, 1974 (Docket No. 15892), stated:

"This record discloses extensive questioning by the trial judge of defendant, his expert witness, and two passengers in defendant's car, called as res gestae witnesses by the prosecution. The bulk of this questioning was aimed at discrediting these witnesses. The conduct of the trial judge not only pierced the veil of judicial impartiality, it tended to impart to the jury the judge's disbelief in the credibility of the witnesses, thus compounding the error, *People v Young,* 364 Mich 554; 111 NW2d 870 (1961). We reverse for a new trial."

Dickinson was charged with manslaughter in the driving of an automobile. As the Court of Appeals noted, the trial judge extensively questioned the defendant, his expert witnesses, and two passengers in defendant's car called as res gestae witnesses by the prosecution. The following colloquy took place between the respondent and one of the passengers of defendant's automobile:

"*The Court:* Why was it that you did not want to make a written statement to the police officers?

"*The Witness:* Because I just didn't want to, that is all I can say.

"*The Court:* That has been established, I asked you why?

"*Mr. Semerly:*[20] If the Court please, I am going to object at this time.

"*The Court:* You may object, counselor. Sit down, the Court is asking the question.

"*Mr. Semerly:* Can I state my objection on the record?

"*The Court:* No, you may take all the exception you want to out of presence of the jury. Answer my question.

---

[20] Mr. Semerly was defense counsel in *Dickinson, supra.*

"*The Witness:* I just didn't want to because I didn't know what it would get in or what was going to happen or what not.

"*The Court:* What do you mean what you would get into or what was going to happen?

"*The Witness:* They didn't tell me what was going on or what was happening. They just asked me to sign, write a statement and I just didn't sign—write one.

"*The Court:* Did you have the feeling that something was going to happen to you?

"*The Witness:* No.

"*The Court:* Well, why was it then that it concerned you what was going to or might happen?

"*The Witness:* I don't know.

"*The Court:* What do you mean 'you don't know'?

"*The Witness:* I don't know why I didn't write one.

"*The Court:* What?

"*The Witness:* I don't know why I didn't write one, I could have wrote one."

At a later point in the jury trial in *Dickinson,* the respondent interrupted defense counsel's examination of a defense witness telling counsel that his questions were out of order as too leading. The prosecutor (Mr. Deitrick) had made no objection to this line of questioning.

"*The Court:* Counselor, I believe this is your witness, isn't it?

"*Mr. Semerly:* Yes, it is.

"*The Court:* All right. Your questions are out of order as being too leading.

"*Mr. Semerly:* Well, Your Honor, I heard no objection from counselor.

"*The Court:* I made the statement and the ruling, and that is all that is needed.

"*Mr. Semerly:* Would you read back the last question I asked?

"*The Court:* The question is improper, it will not be

read back, and the jury is instructed not to consider it. It is an improper question.

"*Mr. Semerly:* What is your testimony as to the distance with which you can see in that picture, Exhibit No 3, on the right-hand side?

"*Mr. Deitrick:* Your Honor, that has been asked and answered, he is just doing this to emphasize it. I don't mind him emphasizing in his argument.

"*The Court:* Objection sustained."

While a trial court may occasionally have to lend guidance to counsel, the respondent's interference in *Dickinson* was properly characterized by the Court of Appeals when they held that he had "pierced the veil of impartiality".

In *People v Danny Turner,* Eaton County Circuit Court No 127-71-C, the defendant was charged with felonious assault[21] and was bound over to the circuit court. At the hearings before the Master, the former prosecutor testified that prior to trial his office filed more than one motion for nolle prosequi. The prosecutor's office was convinced that Turner was innocent of the charges. The motions were denied by the respondent and a trial by jury took place.

At the trial, the respondent vigorously cross-examined the defendant. Respondent's questions went into areas that were irrelevant and prejudicial in light of the charges:

"*Q.* You were in Vietnam?
"*A.* Yes, I was.
"*Q.* In combat?
"*A.* Yes, sir.
"*Q.* How long were you in combat?

---

[21] Turner was charged with felonious assault with a knife. The respondent amended the information and added the language "or other weapon" over the prosecutor's objection and the objection of defense counsel.

"*A.* Five months.

"*Q.* Did you use a knife at all in combat?

"*A.* If it was necessary to use a knife.

"*Q.* Did you use a knife in combat?

"*A.* No, sir, I didn't use a knife on anything.

"*Q.* Were you taught how to use a knife in combat?

"*A.* Yes, if necessary.

"*Mr. Zimmer:* I have to object. I'm in a peculiar situation.

"*The Court:* Your objection is noted on the record. You may state it later.

"*Mr. Zimmer:* It has to do with this particular line of questioning. I can't later. I want the Court to stop.

"*The Court:* Counselor, you have an objection to my line of questioning. Now, you sit down.

"*Mr. Zimmer:* I don't have—

"*The Court:* Counselor.

"*Mr. Zimmer:* Thank you, your Honor.

"*Q. (By the Court):* You were trained in the art of using a knife in combat?

"*A.* Yes, sir, we were. On the end of a rifle, I might add."

The respondent further questioned the defendant in a vigorous "prosecutorial" manner:

"*Q.* Will you take a second and refresh your memory and tell me as best you can recall either what you said or the substance of what you said to Mr. Smith about getting away?

"*A.* I don't know. I can't hardly remember. It's been a long time ago, but I told him to get away. I don't know if I said, 'I'll get you,' or 'cut you,' or whatever. I can't remember. It's been a long time.

"*Q.* Could you have said those things?

"*A.* I probably could have, yes.

"*Q.* Do you have any reason to believe that when Mr. Smith and Mr. Williams testified that you said those things that they weren't telling the truth?

"*A.* Sir?

"*Q.* Do you have any reason to believe that Mr. Smith and Mr. Williams were not telling the truth when they told this Jury and this Court that that is what you did say?

"*A.* I don't believe a lot of things they been saying, no. I do believe that particular stuff.

"*Q.* Then, you did tell them to get away?

"*A.* I told them that, yes.

"*Q.* And you did say something along the line, you probably said, 'I'll get you'?

"*A.* Yes, I think that.

"*Q.* You could have said something along that line?

"*A.* Yes.

"*Q.* But you don't recall exactly what?

"*A.* No, sir, I don't.

"*The Court:* You may step down."

At a further point in the *Turner* trial, the following exchange took place between the counsel and the respondent out of the hearing of the jury:

"*Mr. Zimmer:* The Court would not permit me to interpose an objection at a time when the Court was interrogating Mr. Turner. The Court indicated that I made a previous objection and would consider it as a continuing objection. At that time my objection was not specifically as a general matter that the Court should not participate in questioning, but that the Court was asking questions concerning material which was irrelevant, that is, the use of a knife by the Defendant in the Army and you see, Your Honor, if I'd asked the question and Mr. Dunnings had objected, I think it would be irrelevant and prejudicial. When the Court asks it, it puts counsel in the position of having to object to the person who is asking the question, and I merely want to indicate I consider that irrelevant.

"*The Court:* Very well. The record will so indicate your objection.

"Let me say that, perhaps, you should read a little bit about trial procedures and the responsibilities of the judge in examining witnesses to get the truth before the

jury. *I think that would assist you in your trial manners and many unnecessary objections which you make.* "(Emphasis added.)

At another point in the trial, the respondent told the prosecutor to place a particular witness on the stand.

Before the closing argument in *Turner,* the prosecutor moved to strike the "or other weapon"[22] language from the information before the case was considered by the jury. The following colloquy took place between the respondent and the prosecutor out of the hearing and presence of the jury:

"*The Court:* The Court ordered that the information be corrected and couched in the statutory language at least six or eight months ago. It amazes me as I have said earlier how it comes to this point. Now, I realize, Mr. Zimmer, you had no desire for some unknown reason to process this case from the beginning. You have made repeated attempts to introduce improper evidence. You have made repeated requests on what appear to me to be facetious motions to retire the jury just like this morning when you had an opportunity in chambers to advise the Court that you had a motion before the jury was brought in, but you didn't see fit to do it until the jury was brought in so they could again be sent out to the jury room. I have repeatedly ruled on this. You have a responsibility under your constitutional mandate to fulfill your responsibilities to the People of this County. For some reason you have seen fit, at least in this case, not to do it. So it is necessary for the Court to order it. There's no basis for amending the information. There's a factual issue created for the jury and the jury will make the determinations. It is not an issue.

"*Mr. Zimmer:* Your Honor—excuse me.

"*The Court:* Would you sit down, Mr. Zimmer, so you can hear.

---

[22] See fn 21, *supra.*

*"Mr. Zimmer:* Yes.

*"The Court:* You can't hear when you are talking.

"You have made repeated attempts to do this throughout the entire case. This case has previously been set for trial. One thing has led to another. This Defendant is entitled to an early trial so that the jury can determine whether or not he is guilty or innocent or not guilty.

*"Mr. Zimmer:* May I speak, your Honor?

*"The Court:* Your motion is denied.

*"Mr. Zimmer:* Yes, but since the Court has made reference—

*"The Court:* I don't care for any of your comments.

*"Mr. Zimmer:* Your Honor, they must be made, placed on the record. This Court has indicated what has been—what happened outside of this record and I am entitled to put my interpretation.

*"The Court:* Were you in my chambers this morning?

*"Mr. Zimmer:* I was in your chambers.

*"The Court:* How long?

*"Mr. Zimmer:* I will not subject myself to cross-examination.

*"The Court:* Sit down or I will hold you in contempt of Court. Your insolent behavior before this is purely outstanding.

*"Mr. Zimmer:* I mean no insolence. I only mean to make a record.

*"The Court:* The record will indicate your attitude and your irresponsibility.

*"Mr. Zimmer:* Thank you, your Honor."

In describing respondent's conduct, a former assistant prosecutor testified that:

"The sum and substance of what I am saying is that in every case that I was ever involved in as an Assistant Prosecutor, the judge did everything that he could do in the trial of it to insure the conviction of defendant."

Paragraph 14 of the complaint[23] describes the *Ronald Foster* "haircut" case. Canon 21 held:

"Judicial Canon 21. Idiosyncrasies and Inconsistencies.

"Justice should not be moulded by the individual idiosyncrasies of those who administer it. A judge should adopt the usual and expected method of doing justice, and not seek to be extreme or peculiar in his judgments, or spectacular or sensational in the conduct of the court. Though vested with discretion in the imposition of mild or severe sentences he should not compel persons brought before him to submit to some humiliating act or discipline of his own devising, without authority of law, because he thinks it will have a beneficial corrective influence.

"In imposing sentence he should endeavor to conform to a reasonable standard of punishment and should not seek popularity or publicity either by exceptional severity or undue leniency."

*Foster* indicates a clear violation of Canon 21. A reduction of the defendant's bond from $10,000 to $500 was based solely on having his hair cut in a fashion similar to that of respondent. (Photographs show Foster's hairstyle before the cutting and after his two months in jail as moderate in the context of the 1970's). The defendant was compelled "to submit to some humiliating act or discipline of [respondent's] own devising without authority of law".

We make no attempt here to enumerate every instance of misconduct. A few typical instances are described. In *Geiler, supra,* the Supreme Court of California eloquently elucidated the real evils inherent in the abuse of judicial power:

"It is immaterial whether petitioner's abuse of power

---

[23] See fn 14, *supra.*

resulted in just or unjust treatment for any given defendant. It is undisputed that petitioner bore no ill will towards the individual defendants enumerated in count six. Petitioner's bad faith was directed towards our legal system itself; his arbitrary substitutions of counsel because of his personal beliefs as to the defendants' guilt and his personal hostility to their counsel smacks of an inquisitorial intent to serve imagined truth at the expense of justice. Our adversary system of justice and our elaborate procedure for the prosecution of alleged criminals represents an institutional recognition of the fallibility of the individual. Much as our political system apportions power among jealous branches of government, so within the judicial branch we have striven to disperse the functions of the judicial process among many adverse participants in the hope that the institutions of our legal system will bear a collective capacity for justice and righteousness which no single mortal can achieve. It is this commitment to institutional justice which petitioner's individual conduct threatens to corrupt. Risk of recurrence of such conduct cannot be tolerated."

While the Commission found the respondent "grossly lacking" in judicial temperament and "devoid of the basic concepts of impartiality in the conduct of trials," it did not deem him to be lacking in integrity. Even respondent's severest critics found him to be industrious and diligent in the work of the law.

Respondent's integrity and industry prompt the Court to reject removal from office. Instead, we order that he shall not sit as a judge in a Michigan state court until the expiration of one-and-one-half years from this date and that during this period, he shall receive no judicial pay. This order shall apply regardless of respondent's possible intervening reelection to office or election to any other state court. Pursuant to GCR 1963, 866, the

clerk is ordered to issue final process immediately upon release of this opinion.

KAVANAGH, C. J., and WILLIAMS, LEVIN, and COLEMAN, JJ., concurred.

FITZGERALD, LINDEMER and RYAN, JJ., took no part in the decision of this case.