IN THE MATTER OF LASTER

Docket No. 60476. Argued March 7, 1978 (Calendar No. 6).—Decided
    January 3, 1979.

    The Judicial Tenure Commission found Judge Clarence Laster of
        the Recorder's Court of Detroit guilty of misconduct in ordering
        forfeitures of bail bond money set aside in 58 cases and penal-
        ties remitted to Charles Goldfarb, a bail bondsman, where the
        bonds had originally been forfeited to Wayne County by order
        of other recorder's court judges. Some of the remissions were
        ordered on Sundays when the respondent was sitting as "Sun-
        day judge" for the court. The respondent acted on the petitions
        in open court, but no stenographic records were made of the
        proceedings and no notices of the proceedings were served on
        the prosecuting attorney or corporation counsel for Wayne
        County. The Judicial Tenure Commission found that the re-
        spondent's conduct gave the appearance of impropriety and
        recommended a public reprimand. Respondent appeals. *Held:*

        1. The respondent persisted in a course of action which gave
        the appearance of impropriety and was thus clearly prejudicial
        to the administration of justice. The things which give the
        appearance of impropriety are: (1) an *ex parte* discussion with
        Goldfarb and the agreement to hear motions seeking the return
        of a large sum of money from the county treasury; (2) the fact
        that Goldfarb began sending wholesale groups of petitions to
        the respondent; (3) the fact that, with rare exception, no judges
        other than Judge Laster and Judge Del Rio, since suspended,
        remitted bonds which were more than three years old while 90
        percent of the remissions by Laster were on bonds older than
        three years; (4) the fact that almost all the bonds remitted by
        Judge Laster were originally ordered forfeited by other judges;
        (5) the fact that the remissions on the old bonds were accom-
        plished without the prior knowledge of the prosecutor, corpora-

REFERENCES FOR POINTS IN HEADNOTES
[1, 5, 6-11] 46 Am Jur 2d, Judges § 50.
[2] 46 Am Jur 2d, Judges § 84.
[3] 46 Am Jur 2d, Judges § 222.
[4] 46 Am Jur 2d, Judges §§ 86, 166.
[7] 46 Am Jur 2d, Judges § 119.

tion counsel or court clerk; and (6) the fact that the respondent did not assess costs against Goldfarb in any of the 58 cases, but instead merely accepted Goldfarb's blanket statement that there were none.

2. The respondent's activities give the appearance of impropriety in that they appear to have involved favoritism and partiality. Regardless of his motivations, respondent created an atmosphere in which Goldfarb could continue to bring to him old bonds for remission and thus effectively by-pass the judges who originally forfeited the bonds. This ongoing pattern of conduct also gives rise to the appearance of cronyism and judge shopping.

3. There is no doubt that "good faith" should be considered as mitigating acts of misconduct but not as an affirmative defense to charges of misconduct. The commission's recommendation took into account all the mitigating factors, including "good faith", in recommending a public reprimand rather than a more severe penalty. Nevertheless, these factors do not counterbalance the respondent's persistent abandonment of statutory procedures, court rules and simple fair play.

4. The existence of appellate review to remedy a judge's conduct does not divest the commission of its jurisdiction to review that same conduct for judicial misconduct. Judicial conduct creating the need for disciplinary action can grow from the same root as judicial conduct creating potential appellate review, but one does not necessarily exclude the other. One path seeks to correct past prejudice to a particular party; the other seeks to prevent potential prejudice to future litigants and the judiciary in general.

5. The respondent's conduct in these bond remission proceedings has fallen short of the standard that a judge must not only be independent and honest, but, equally important, be believed by all men to be independent and honest. His conduct in these matters has displayed, at the very least, an appearance of impropriety. An image of favoritism, cronyism, and judge shopping is readily discerned. A strong, independent, and honest judiciary cannot allow such an image to exist. Therefore, the respondent is reprimanded for his conduct.

Justices Williams and Ryan, concurring, would hold the respondent's persistent abandonment of statutory procedures, court rules and simple fair play amounted to judicial impropriety.

Justice Levin, with Chief Justice Kavanagh, dissented.

1. Disciplinary action should not be based upon conduct

which cannot fairly be called improper merely because such conduct may appear to be improper. Appearances are too highly subjective and dependent upon the perspectives and biases of the beholder to provide, without more, a basis for disciplinary action.

2. The debatable character of the legal questions whether a judge may remit a forfeited bail bond (i) after more than one year (ii) in another judge's case (iii) on a Sunday (iv) without notice of presentment of the petition and order to the prosecutor and without motion praecipe (v) without awarding costs on an *ex parte* affidavit of the bondsman that the people incurred no costs in apprehending the absconding defendant depend on a construction of the relevant statutes and an understanding of the practice of the Recorder's Court. What the respondent did either violated the law or it did not. Either he abused his office by acting surreptitiously or for his own benefit or he did not. The record shows that he acted in good faith pursuant to a reasonable and, certainly, arguable construction of the statutes, rules and practices of the Recorder's Court. He viewed the remission of forfeited bonds as a civil matter of concern to the court and the bondsman. He was also concerned that innocent friends or relatives of the defendant, who were sureties on the bonds, would suffer foreclosures of their property even though the defendant had been apprehended and the county had suffered no loss. In his view, the county had no interest when the defendant is apprehended at no cost to the county. Remittance petitions were brought to the respondent because he held these views. Unless this Court is prepared to say that a judge may not exercise his discretion to give effect to his judicial philosophies within the bounds of statutes, court rules and practice, it does injustice by reprimanding a judge because a bail bondsman "shopped" for him.

3. The record supports the findings of fact by the Master, an experienced and highly regarded circuit judge, who credited Judge Laster's testimony regarding his motives for remitting the bonds. The commission adopted the Master's findings of fact but concluded that he erred in his conclusion that no sanction should attach, and that there were repeated numerous statute and court rule violations. After the commission had an opportunity to present its case before a Master, it found it necessary to cast its reasons for disciplinary action in terms of suspicions and the appearance of impropriety. The Supreme Court's decision is founded on equally shaky ground: Judge Laster is found to have created an atmosphere in which the bondsman could continue to bring him old bonds for remission and thus effec-

tively by-pass the judges who forfeited the bonds. Judge Laster did not create that atmosphere; rather, the Recorder's Court itself, in its informal practices and unclear rules, did. The undisputed testimony is that the Recorder's Court was a "court of an informal nature" and that the court rules were "loosely interpreted". Judge Laster should not be reprimanded for adhering to the loose practices of the court.

4. Judge Laster is disciplined by the Supreme Court because, while he has committed no impropriety, he has not successfully avoided all appearances of impropriety. The Code of Judicial Conduct rightly calls upon a judge to act properly and avoid the appearance of improper action, but a judge should not be disciplined for seemingly improper conduct which, upon examination, turns out to be proper. The court rules require more of the Supreme Court than its conclusory statement that Judge Laster's conduct "gave the 'appearance of impropriety' and was thus 'clearly prejudicial to the administration of justice' ".

### OPINION OF THE COURT

1. JUDGES — MISCONDUCT — BAIL BONDS — FORFEITURE — REMISSION.

A judge of the Recorder's Court of Detroit was guilty of misconduct in persisting in a course of action which gave the appearance of impropriety in granting a bail bondsman's petitions to set aside forfeitures to Wayne County of bail bond money in 58 cases where the judge had *ex parte* discussions with the bondsman and agreed to hear motions seeking the return of a large sum of money; wholesale groups of petitions for remission were sent to the judge; 90% of the remissions were on bond forfeitures more than three years old, which was rare among other judges; almost all the bonds remitted were originally ordered forfeited by other judges; the remissions were ordered on Sundays without notice to the prosecutor, corporation counsel, or court clerk; and the judge accepted the bail bondsman's blanket statement that there were no costs to be assessed against him (MCL 726.2, 765.15; MSA 27.3552, 28.902; Code of Judicial Conduct, Canon 2; GCR 1963, 772.4, 932.4; RCR 18).

2. JUDGES — MISCONDUCT — MITIGATION — GOOD FAITH.

There is no doubt that "good faith" should be considered as mitigating acts of judicial misconduct but not as an affirmative defense to charges of misconduct; the mitigating factors may be considered by the Judicial Tenure Commission and the Supreme Court in considering a public reprimand for a respondent rather than a more severe penalty but do not counterba-

lance his actions which persistently abandoned statutory procedures, court rules, and simple fair play.

3. JUDGES — MISCONDUCT — APPEAL AND ERROR.

Judicial conduct creating the need for disciplinary action can grow from the same root as judicial conduct creating potential appellate review, but one does not necessarily exclude the other; one remedy seeks to correct past prejudice to a particular party and the other seeks to prevent potential prejudice to future litigants and the judiciary in general.

4. JUDGES — MISCONDUCT — APPEARANCE OF IMPROPRIETY.

A strong, independent, and honest judiciary cannot allow the appearance of favoritism, cronyism, and judge shopping to exist (Code of Judicial Conduct, Canon 2; GCR 1963, 932.4).

CONCURRING OPINION BY WILLIAMS, J.

5. JUDGES — MISCONDUCT — BAIL BONDS — FORFEITURE — REMISSION.

*Persistent abandonment of statutory procedures, court rules and simple fair play by a judge of the Recorder's Court of Detroit in granting a bail bondsman's petitions to set aside forfeitures to Wayne County of bail bond money amounted to judicial impropriety (MCL 726.2, 765.15; MSA 27.3552, 28.902; Code of Judicial Conduct, Canon 2; GCR 1963, 772.4, 932.4; RCR 18).*

DISSENTING OPINION BY LEVIN, J.

6. JUDGES — MISCONDUCT — APPEARANCE OF IMPROPRIETY.

*Disciplinary action against a judge should not be based upon conduct which cannot fairly be called improper merely because such conduct may appear to be improper; appearances are too highly subjective and dependent upon the perspectives and biases of the beholder to provide, without more, a basis for disciplinary action (GCR 1963, 932.4).*

7. JUDGES — MISCONDUCT — GOOD FAITH.

*A judge should not be disciplined for misconduct where the record shows he was acting in good faith pursuant to a reasonable and arguable construction of the statutes, rules, and practices of the court.*

8. JUDGES — MISCONDUCT — BAIL BONDS — FORFEITURE — REMISSION.

*A Recorder's Court Judge should not be disciplined for misconduct because he exercised his discretion, in good faith, to give effect to his view that remission of a bail bond forfeiture is a*

*civil matter of concern to the court and the bondsman, and the county's only interest is to see that the defendant is apprehended and that the county has suffered no loss (MCL 726.2, 765.15; MSA 27.3552, 28.902; GCR 1963, 772.4; RCR 18).*

9. JUDGES — MISCONDUCT — DISCRETION — GOOD FAITH.

*Reprimanding a Recorder's Court Judge for misconduct because a bail bondsman "shopped" for the judge because of his good-faith views on remittance of bail bond money which had been forfeited to the county does an injustice, unless the Supreme Court is prepared to say that a judge may not exercise his discretion to give effect to his judicial philosophies within the bounds of statutes, rules, and practices of the court.*

10. JUDGES — MISCONDUCT — RECORDER'S COURT.

*On a record containing undisputed testimony that the Recorder's Court was a "court of an informal nature" and that the court rules were "loosely interpreted", and no proof or even allegation that its judges sent notice of petitions for remittance of bail bonds to the prosecuting attorney prior to hearing, a judge should not be reprimanded for adhering to the loose practices of the court in not giving such notice.*

11. JUDGES — MISCONDUCT — APPEARANCE OF IMPROPRIETY.

*The Code of Judicial Conduct rightly calls upon a judge to act properly and avoid the appearance of improper action, but a judge should not be disciplined for seemingly improper conduct which, upon examination, turns out to be proper; the court rules require more of the Supreme Court than a conclusory statement that a judge's conduct gave the appearance of impropriety and was thus clearly prejudicial to the administration of justice (Code of Judicial Conduct, Canon 2; GCR 1963, 932.4).*

*Joseph F. Regnier,* Executive Director and General Counsel, for the Judicial Tenure Commission.

*Thomas A. Howard, Arthur J. Cole,* and *Francis W. Higgins* for respondent.

PER CURIAM. The Judicial Tenure Commission (hereinafter the Commission) has recommended that this Court, pursuant to its constitutional authority,[1] publicly reprimand the Honorable Clar-

---

[1] Const 1963, art 6, § 30(2).

ence Laster, Detroit Recorder's Court Judge. Pursuant to GCR 1963, 932.24, Judge Laster, the respondent, has petitioned this Court to reject the recommendation of the Commission claiming that:

1. A *de novo* review of the entire record does not support the Commission's recommendation of a reprimand.

2. He acted in "good faith" at all times as a recorder's court judge and "good faith" stands as an absolute defense to any allegation of judicial misconduct.

3. The existence of appellate review to remedy a judge's conduct divests the Commission of its jurisdiction to review that same conduct for the existence of judicial misconduct.

We have reviewed the entire record *de novo* [2] and conclude that the conduct attributed to Judge Laster, and found by the Commission, is established. Furthermore, we do not find that either Judge Laster's "good faith" intentions or the existence of an appellate avenue for review of Judge Laster's conduct negates the Commission's unanimous conclusion that he should be reprimanded.

## I. FACTS

There is no dispute regarding the essential facts in this case. Only the conclusion to be drawn from those facts is disputed.

Beginning in December, 1973, the respondent entered a series of 58 orders directing payment to bail bondsman Charles Goldfarb of amounts totaling $35,640 in bond money previously forfeited and paid to Wayne County. In all 58 cases in

---

[2] *In the Matter of Del Rio,* 400 Mich 665; 256 NW2d 727 (1977); *In the Matter of Mikesell,* 396 Mich 517; 243 NW2d 86 (1976); *In re Somers,* 384 Mich 320; 182 NW2d 341 (1971).

which the respondent ordered forfeitures set aside and penalties remitted, the bond had originally been forfeited by another recorder's court judge. All of the orders were on photocopied forms and were based upon photocopied form petitions with only the names, dates and amounts written in individually.

Most of the remissions took place on Sunday, but only on those Sundays Judge Laster was sitting as Sunday judge. No notices of any of the petitions of remission were served on the prosecuting attorney or corporation counsel for Wayne County. The respondent acted on petitions in open court, but no stenographic records were made of these proceedings. In two or three instances the judge who had ordered the bond forfeiture had denied a previous motion for refund. No judge of recorder's court, other than the respondent and suspended Judge Del Rio,[3] repeatedly ordered refunds on forfeited bonds that were more than four years old.

Judge Laster testified that, before acting on the bond remissions in question, he read the statute on bond remission[4] and discussed the matter with two former presiding judges of recorder's court, the court's judicial assistant and a member of the Supreme Court's staff. The respondent also testified that he did not believe he was usurping the power of other judges in granting such remissions. Evidently, the practice in recorder's court concerning bond remissions, as distinguished from other bond procedures, was shrouded in uncertainty.

_____

[3] Judge Del Rio was suspended from the recorder's court bench for five years. The misconduct involving Judge Del Rio was much more serious and extensive than that of Judge Laster. However, it also included the clandestine remission of forfeited bail bonds. See *In the Matter of Del Rio, supra,* 713.

[4] MCL 765.15; MSA 28.902.

Respondent testified that the late Chief Judge Murphy told him that he was empowered to remit forfeitures. He also testified that the late Chief Judge Leonard had even considered proposing a court rule to clarify matters. The judicial assistant apparently recognized that confusion existed, and still exists, concerning these procedures.

The respondent instructed that copies of the remission orders be given by the Goldfarb Bonding Agency to the prosecuting attorney upon disposition. It is unclear whether copies of the orders were ever delivered to the prosecuting attorney's office. No member of the prosecuting attorney's staff ever requested a rehearing in the cases involved in these proceedings. It was the view of the respondent that bond remission was a ministerial action, involving judicial discretion, and as such given no attention by the prosecuting attorney. Respondent testified that, as a prosecuting attorney for 17 years, he never was consulted by a recorder's court judge on bond remissions. Thus, he believed the absence of prior notice immaterial.

The bondsman, Charles Goldfarb, was a longtime acquaintance of the respondent. There is no evidence of record that the respondent was motivated by a scheme to promote the interests of the Goldfarb Bonding Agency. The examiner also acknowledges that there is no evidence of record[5] which shows any personal enrichment of Judge Laster. Judge Laster testified that he was not a social friend of Mr. Goldfarb, and he never solicited Mr. Goldfarb for campaign contributions. Judge Laster did admit that Mr. Goldfarb "judge shopped" him in order to obtain the remissions.

---

[5] If any such evidence were present, the penalty imposed would be much harsher. Today's action is only premised upon the "evidence of record".

It appears, however, that no judges other than the respondent and Judge Del Rio entered multiple refund orders on a group or wholesale basis. Other judges remitted bond payments; certain judges entered more such orders than others. But these judges almost uniformly remitted only those bonds previously forfeited by them or their predecessors in office. The total dollar figure on bonds remitted by Judge Laster was slightly less than twice the total of any judge other than Judge Del Rio.[6]

A formal complaint in this matter was filed with the Judicial Tenure Commission on January 12, 1977. On February 8, 1977, this Court denied the Commission's petition for interim suspension and the respondent's motion to dismiss. A master, Judge William Weipert, Jr., of the 38th Judicial Circuit, was appointed. The master conducted a prehearing conference and ordered the formal hearing, which took place on April 25 and 26, 1977. The master filed his report with the Commission on August 18, 1977. He concluded that the respondent should not be suspended and the complaint should be dismissed. On September 30, 1977, the Commission adopted the findings of fact made by the master. The Commission agreed there was no evidence of criminality, but nonetheless found judicial misconduct from facts which gave the appearance of impropriety, and recommended a public reprimand.

## II. Issues

The respondent initially claims that a *de novo*

---

[6] From December, 1973, to September, 1976, Judge Laster remitted 65 bonds previously forfeited. Judge Del Rio remitted 44 bonds. No other recorder's court judge remitted more than 11 bonds during this same period.

review of the entire record does not support the
Commission's recommendation of a reprimand. We
cannot agree.

Canon 2 of the Code of Judicial Conduct[7] pro-
vides:

"Public confidence in the judiciary is eroded by irre-
sponsible or improper conduct by judges. *A judge must
avoid all impropriety and appearance of impropriety.*
He must expect to be the subject of constant public
scrutiny. He must therefore accept restrictions on his
conduct that might be viewed as burdensome by the
ordinary citizen and should do so freely and willingly."
(Emphasis supplied.)

Pursuant to Const 1963, art 6, § 30(2), this Court
adopted GCR 1963, 932.4, which provides:

".4 Standards of Judicial Conduct.

"(a) A judge shall be personally responsible for his
own behavior and for the proper conduct and adminis-
tration of the court or tribunal in which he presides.

"(b) A judge shall be deemed guilty of misconduct in
office if:

\* \* \*

"(iv) His conduct is clearly prejudicial to the adminis-
tration of justice.

\* \* \*

"(d) Conduct in violation of the code of judicial con-
duct or code of professional responsibility and canons,
whether the conduct complained of occurred before or
after the respondent became a judge or was or was not
connected with his judicial office, may constitute mis-

---

[7] Canons of Judicial Ethics (applicable prior to October 1, 1974):

"Judicial Canon 4. Avoidance of Impropriety.

"A judge's official conduct should be free from impropriety and the
appearance of impropriety; he should avoid infractions of law; and his
personal behavior, not only upon the bench and in the performance of
judicial duties, but also in his everyday life, should be beyond re-
proach."

conduct in office or conduct that is clearly prejudicial to the administration of justice or other cause delineated in Const 1963, art 6, § 30. The question in every case is whether the conduct complained of constitutes misconduct in office or conduct that is clearly prejudicial to the administration of justice or there is other cause delineated in Const 1963, art 6, § 30, not whether a particular canon or disciplinary rule has been violated. All the circumstances are to be considered in deciding whether action by the commission is warranted."

We conclude that the respondent persisted in a course of action which gave the "appearance of impropriety" and was thus "clearly prejudicial to the administration of justice".

Several factors specifically give rise to this "appearance of impropriety":

1. the *ex parte* discussion with Goldfarb and the agreement to hear motions wherein Goldfarb, a potential litigant, was seeking the return of a large sum of money from the county treasury;

2. the fact that Goldfarb began sending wholesale groups of petitions to the respondent;

3. the fact that, with rare exception, no judges other than Judge Laster and suspended Judge Del Rio remitted bonds which were more than three years old while 90 percent of the Laster remissions were older than three years;

4. the fact that almost all the bonds remitted by Judge Laster were originally forfeited by another judge or that judge's predecessor;

5. the remissions on the old bonds were accomplished without the prior knowledge of the prosecutor, corporation counsel or court clerk; and

6. the fact that the respondent did not assess costs against Goldfarb in any of the 58 cases, but instead merely accepted Goldfarb's blanket statement that there were none.

Judge Laster's activities give the appearance of impropriety in that they "appear" to have involved favoritism and partiality. Regardless of his motivations, respondent created an atmosphere in which Goldfarb could continue to bring to him old bonds for remission and thus effectively by-pass the judges who originally forfeited the bonds. This ongoing pattern of conduct also gives rise to the appearance of "cronyism" and "judge shopping".

This Court, as well as the Commission, acknowledges many of the mitigating factors which the respondent presents. The Commission's recommendation took into account all the mitigating factors, including "good faith". Nevertheless, we agree that these factors do not counterbalance the respondent's persistent abandonment of statutory procedures, court rules[8] and simple fair play.

The respondent next claims, in a series of interrelated issues, that he acted in "good faith" at all times during these bond remission proceedings and his good faith stands as an absolute defense to any allegation of judicial misconduct. Again, we cannot agree.

There is no doubt that "good faith" should be considered as a mitigating factor to acts of misconduct but not as an affirmative defense to charges of misconduct. See, for example, *Spruance v Commission on Judicial Qualifications,* 13 Cal 3d 778; 119 Cal Rptr 841; 532 P2d 1209 (1975). The Commission has duly weighed the mitigating factors in recommending a public reprimand rather than a more severe penalty. We agree with the Commission's recommendation in this matter.

Finally, the respondent asserts that the existence of appellate review to remedy a judge's

---

[8] See, *inter alia,* MCL 726.2; MSA 27.3552, MCL 765.15; MSA 28.902, GCR 1963, 772.4, and Recorder's Court Rule 18.

conduct divests the Commission of its jurisdiction to review that same conduct for the existence of judicial misconduct. We do not agree. Judicial conduct creating the need for disciplinary action can grow from the same root as judicial conduct creating potential appellate review, but one does not necessarily exclude the other. One path seeks to correct past prejudice to a particular party; the other seeks to prevent potential prejudice to future litigants and the judiciary in general. See *In re Judges of Cedar Rapids Municipal Court,* 256 Iowa 1135; 130 NW2d 553 (1964).

### III. CONCLUSION

This Court has cited *In re Greenberg,* 442 Pa 411, 416; 280 A2d 370 (1971), and Tamm, *Are Courts Going the Way of the Dinosaur?,* 57 ABA J 228 (March, 1971), in two recent opinions concerning judicial misconduct:

"For generations before and since it has been taught that a judge must possess the confidence of the community; that he must not only be independent and honest, but, equally important, believed by all men to be independent and honest. *A cloud of witnesses testify that 'justice must not only be done, it must be seen to be done.'* Without the appearance as well as the fact of justice, respect for the law vanishes in a democracy." (Emphasis added.)

See *In the Matter of Del Rio,* 400 Mich 665, 725; 256 NW2d 727 (1977), and *In the Matter of Bennett,* 403 Mich 178, 198; 267 NW2d 914 (1978).

We believe Judge Laster's conduct in these bond remission proceedings has fallen short of this standard. His conduct in these matters has displayed, at the very least, an appearance of impropriety.

An image of favoritism, cronyism and judge shopping is readily discerned. A strong, independent and honest judiciary cannot allow such an image to exist.

Therefore, Judge Laster is forthwith reprimanded for his conduct.

COLEMAN, FITZGERALD, and BLAIR MOODY, JR., JJ., concurred.

WILLIAMS, J. *(concurring)*. I concur except that I would hold the respondent's persistent abandonment of statutory procedures, court rules and simple fair play amounted to judicial impropriety.

RYAN, J., concurred with WILLIAMS, J.

LEVIN, J. *(dissenting)*. The Court reprimands Judge Laster for conduct "which gave the appearance of impropriety". Neither the Judicial Tenure Commission nor the Court is prepared to say that Judge Laster's actions were improper in fact or directed to his own advantage.

The Court disciplines a respected judge of hitherto unquestioned integrity because his "activities give the appearance of impropriety in that they 'appear' to have involved favoritism and partiality" and his "ongoing pattern of conduct also gives rise to the appearance of 'cronyism' and 'judge shopping' ".

The Court does not say and, indeed, the record negates that there was, in fact, any favoritism, partiality or cronyism; rather, it is the mere appearance of misdeeds that is to be Judge Laster's nemesis.

Disciplinary action should not be based upon conduct which cannot fairly be called improper merely because the conduct may appear to be

improper.[1] Appearances are too subjective and dependent upon the perspectives and biases of the beholder to provide, without more, a basis for disciplinary action.

Resolution of the constructional questions whether a judge may remit a forfeited bail bond

(i) after more than one year

(ii) in another judge's case

(iii) on a Sunday

(iv) without notice of presentment of the petition and order to the prosecutor and without motion praecipe

(v) without awarding costs on an *ex parte* affidavit of the bondsman that the people incurred no costs in apprehending the absconding defendant

depends on construction of the relevant statutes and court rules and Recorder's Court practice. What Judge Laster did either violated the law or it did not. Either he abused his office by acting surreptitiously or for his own benefit or he did not.

The record shows that Judge Laster acted in good faith pursuant to a reasonable and, certainly, arguable construction of the statutes, rules and practices of the Recorder's Court.

Judge Laster viewed the remission of forfeited bonds as a civil matter of concern to the court and the bondsman. He was also concerned that innocent friends or relatives of the defendant, who were sureties on the bonds, would suffer foreclosures of their property although the defendant had

---

[1] The Code of Professional Responsibility, DR 9-101 and 9-102, in speaking of the avoidance of "the appearance of professional impropriety", spells out with particularity the prophylactic rules to be observed by lawyers. GCR 1963, 912, particularizes the bases for disqualification of a judge to avoid impropriety and the appearance of impropriety and the procedure to be observed. Canon 2 of the Canons of Judicial Conduct similarly particularizes regarding misuse of judicial office and appearances by a judge as a witness.

been apprehended and the county had suffered no loss. In his view, the county had no further interest when the defendant had been apprehended at no cost to the county.

Remittance petitions were brought to Judge Laster because he held these views. Unless this Court is prepared to say that a judge may not exercise his discretion to give effect to his judicial philosophies within the bounds of statutes, court rules and practice, it does injustice by reprimanding Judge Laster because Charles Goldfarb, the bondsman, shopped for him.

I

Judge Laster remitted the forfeitures of 58 bonds written by Goldfarb.

The remissions were ordered

1) in cases where the bond had originally been forfeited by a different judge, an alleged violation of MCL 726.2; MSA 27.3552,[2]

2) in cases where the bond had been forfeited several years before, an alleged violation of MCL 765.15; MSA 28.902,[3]

3) without notice to the county, an alleged violation of GCR 1963, 772.4,[4] and

---

[2] "[N]o judge of said court shall review or revise any order, judgment, sentence or act of any other judge of said court, involving the personal discretion, judgment or opinion of such other judge." MCL 726.2; MSA 27.3552.

[3] "The court shall set aside the forfeiture and discharge the bail or bond, within 1 year from the time of the forfeiture judgment, in accordance with subsection (b) of this section if the person who forfeited bond or bail is apprehended and the ends of justice have not been thwarted and the county has been repaid its costs for apprehending the person." MCL 765.15; MSA 28.902.

[4] "No application for the remission of penalties may be heard until reasonable notice has been given to the prosecuting attorney, and until he has had an opportunity to examine the matter and prepare to resist such application; nor shall such application in any case be granted without payment of the costs and expenses incurred in the proceedings for the collection of such penalty." GCR 1963, 772.4.

4) on Sundays.

We address each allegation in turn.

1. The Commission contends that remitting bonds forfeited by other judges constitutes "review" or "revision" of an "order" or "act" of another judge of the court "involving personal discretion". MCL 726.2; MSA 27.3552.

The Master found:

"Except by isolated error and inadvertence, Judge Laster was careful to make sure that he did not overrule a previous refusal of bond remittance by another judge, instructing his clerk to check each file in this respect. He did not believe that the remissions granted by him in any way overruled the decision of the judge who had originally forfeited the bond. This view cannot be found clearly unreasonable, since *forfeiture* and *remittance* are entirely dissimilar [emphasis added]. While the original decision to enter a judgment on the bond is based on a mere ascertainment of whether a principal has failed to appear, the decision to *remit* a judgment on a bond requires an ascertainment under [MCL 765.15(a);] MSA 28.902(a) of whether the person who forfeited bond or bail is apprehended and the ends of justice have not been thwarted. * * *

*     *     *

"Concerning remission of bonds forfeited and paid, as distinguished from other bond procedures * * * , *the practice in Recorder's Court, during the times involved in these proceedings, was shrouded in uncertainty* [emphasis added]. Chief Judge Leonard proposed a court rule to clarify the matter so the judges of the court could have a standard to follow. The late Judge Murphy told Judge Laster he was empowered to remit forfeitures. Judge Murphy was the presiding judge at that time. The Recorder's Court Judicial Assistant recognized that confusion exists."[5]

---

[5] The Master also found:

"Prior to acting on the bond remission petitions in question in this proceeding, Judge Laster read the statute on bond remitters, discussed the matter with two presiding judges [Judges Murphy and

The Commission itself said:

"It is easily recognizable that remission is different from forfeiture but it would have been better in those cases where the forfeiting judge was available to present the petition for remission to the forfeiting judge. Thus, the appearance of judge shopping for partiality and favoritism would have been avoided."

2. Judge Laster remitted 44 bonds forfeited more than one year earlier, assertedly in violation of MCL 765.15; MSA 28.902. While some judges thought the statute authorizes remittances only within one year after forfeiture, a number of other judges did not share that view and remitted bonds that had been forfeited more than one year earlier. The Commission does not question Judge Laster's good faith in construing the statute, with other judges, as making remission mandatory (the statute uses the word "shall") if the conditions are met within one year and discretionary thereafter.

3. The Commission charged that the failure to provide the prosecutor with prior notice of the remittance proceedings constituted a violation of GCR 1963, 772.4, concerning "remission of penalties".[6] The Master found:

"It was the further view of Judge Laster, found to be held in good faith, that bond remittance was to a large extent ministerial action, although involving exercise of

Leonard], with the court's judicial assistant and with Mr. Levitt, a member of the Supreme Court's staff.

"Judge Laster, by his testimony which is fully credited by the Master, did not believe that he was usurping the power of other judges in granting such remissions. 'As I understood it, the matter of remission had not been passed upon by any other judge.' Had it been, 'I didn't think that I would have authority to act.' "

[6] It also said that a motion praecipe to bring the matter on for hearing should have been filed under Recorder's Court Rule 18. Yet that rule deals with felony motions. Bond remittance is a civil matter.

judicial discretion, and as such was given no attention by the Prosecuting Attorney but considered to be between the bondsman and the court. *As a prosecuting attorney for 17 years, he had never once been consulted by a Recorder's Court Judge on bond remissions* [emphasis added]. Hence he found the absence of notice to the Prosecuting Attorney or absence from the courtroom immaterial."

Judge Laster testified that he believed that his duty in remitting bonds was to determine that the requirements of the statute were satisfied. He required that the petition state under oath that the case was closed, the defendant had been brought to justice, and the county had been reimbursed for any costs. If satisfied that those requirements had been met, he entered the orders *ex parte,* and instructed the clerk to deliver copies of the orders to the prosecutor. The Master said:

"Judge Laster further instructed his clerk to give a copy of the remittance order to the Prosecuting Attorney upon its filing. 'If the prosecutor had any objections to it he could notify the court, and if necessary I could grant him a rehearing.' No member of the Prosecuting Attorney's staff ever requested a rehearing in the cases involved in this proceeding."

The Master noted Judge Laster's experience with the informal practices of Recorder's Court as an assistant prosecutor for 17 years and as a judge:

"As known to Judge Laster from his prior experience as above stated, and after becoming a member of the bench, the Recorder's Court was a 'court of an informal nature' with 'very little filing of legal documents,' and the court rules were 'loosely interpreted.' 'They are not

strictly adhered to by the members of the bench or by the attorneys who practice before the court, both defense attorneys and the Prosecuting Attorney.' This lack of formality was 'a matter of expeditiousness more than just a matter of lack of concern, due to the great volume of cases coming before the court on a daily basis."

Consistent with this informality, judges of the Recorder's Court regularly forfeited bonds *ex parte* where the defendant failed to show on a given date. Yet, a statute arguably requires notice to the surety in such cases.[7]

4. The Commission stresses that 38 of the bonds were remitted on Sundays. The Master found:

"The Sunday sessions referred to above were not specially called for this purpose. Judge Laster was on assigned duty at those times, presiding as the single Sunday judge of the multi-judge court, and he acted in open court. His court was fully staffed with clerk and court reporter. The files in these cases had been collected by his court clerk, who had been instructed by Judge Laster to check them. The petition for remittance in each case was fully read and considered by Judge Laster before being granted and the order signed."

---

[7] "In addition to any other method available, it is hereby provided that whenever default shall be made in any recognizance in any court of record, the same shall be duly entered of record by the clerk of said court and thereafter said court, upon the motion of the attorney general, prosecuting attorney or city attorney, may give the surety or sureties 20 days' notice, which notice shall be served upon said surety or sureties in person or left at his or their last known place of residence. Said surety or sureties shall be given an opportunity to appear before the court on a day certain and show cause why judgment should not be entered against him or them for the full amount of such recognizance. If good cause is not shown, the court shall then enter judgment against the surety or sureties on said recognizance for such amount as it may see fit not exceeding the full amount thereof. Execution shall be awarded and executed upon said judgment in like manner as is provided in personal actions." MCL 765.28; MSA 28.915.

See *People v Person,* 44 Mich App 630; 205 NW2d 610 (1973).

To the Commission's allegations of improper conduct, this Court adds:

"The *ex parte* discussion with Goldfarb and the agreement to hear motions wherein Goldfarb, a potential litigant, was seeking the return of a large sum of money from the county treasury;"

and

"The fact that respondent did not assess costs against Goldfarb in any of the 58 cases but instead merely accepted Goldfarb's blanket statement that there were none."

The *ex parte* discussion and agreement to hear motions, to which the Court refers, was described by the Master:

"In a courtroom conversation, so far as the record shows on one occasion only, Charles Goldfarb inquired whether he [Judge Laster] would entertain remission petitions from time to time, in cases where collateral which would otherwise be foreclosed existed."

Judge Laster testified:

"I told him if upon filing the petitions—upon reading of the petitions, rather, and if they met the criteria of the law as I understood it to be, then I would give him the remittance."

The petitions were, indeed, granted in large groups. But the Master found:

"The petition for remittance in each case was fully read and considered by Judge Laster before being granted and the order signed."

Judge Laster relied on affidavits under oath that no costs had been incurred by the county. The prosecutor was to receive a copy of each order of remittance so that he could notify the court if any of the claims were incorrect. The Master found:

"Review of all the files in question by Judge Laster since these proceedings began showed, by his uncontradicted testimony, the claims of the petitioner to be correct, *viz.,* the defendant had in fact been apprehended, and no costs had been incurred by the county or not refunded."

## II

The record supports the findings of fact by the Master, Judge William Weipert, Jr., an experienced and highly regarded circuit judge, who had the opportunity to observe the witnesses and their demeanor and credited Judge Laster's testimony regarding his motives for remitting the bonds. The Commission adopted those findings, and this Court does not find the facts to be otherwise. The Master found:

"Judge Laster's actions, in question in these proceedings, are shown by his testimony to have been motivated by his belief that surety bonds and their availability at reasonable prices serve a humane purpose, to effectuate which remedial statutes on remission should be construed broadly, and judicial discretion employed. He was concerned also with humane treatment of family and friends of convicted persons who had posted collateral with the bondsman to secure the bond. Having been advised by Mr. Goldfarb that such collateral existed, and would be foreclosed if remission petitions were not filed, he did not believe that the public treasury should be enriched and homes or securities foreclosed, if proper grounds for remission existed."

"There is no evidence whatever that Judge Laster's

actions, motivated as above found, were in any way part of a scheme to promote the business interests of the Goldfarb Bonding Agency, although the latter benefited. The examiner acknowledges that no evidence shows personal enrichment of respondent. * * * "

"There is no evidence that Judge Laster showed favoritism to Charles Goldfarb, nor that he acted in these matters because of friendship, or reason other than his own beliefs and judicial philosophy as set forth above."

"No facts appear in the record that suggest any impropriety or appearance of impropriety on Judge Laster's part relative to Charles Goldfarb or that he acted in consort with the bonding agency."

Although the Commission adopted the Master's findings of fact, it concluded:

"[T]he Master erred in his conclusion that no sanction should attach. A technical violation is easily excusable but the very persistence of respondent's conduct in repeated violations requires us to recommend discipline. There surfaced numerous statute and court rule violations."

The Commission also said:

"It is suspicious that of all the bonds refunded no costs were awarded to the people apparently on the *ex parte* affidavit of the bondsman that the people incurred no costs in apprehending the absconding defendant."

There was no proof, however, that any costs had been incurred by the county in apprehending any defendant. It should give us pause that, after the Commission has had an opportunity to present its case before a Master, it should find it necessary to cast its reasons for disciplinary action in terms of suspicions.

The Commission continued:

"The manner and timing in which the orders were entered, particularly at Sunday sessions, gave the appearance of impropriety.

"We conclude that respondent persisted in a course of action which gave the appearance of impropriety. Subjective good intentions to the contrary, we are of the opinion that this constitutes judicial misconduct."

This Court's decision is founded on equally shaky ground. Judge Laster is found to have "created an atmosphere in which Goldfarb could continue to bring to him old bonds for remission and thus effectively by-pass the judges who originally forfeited the bonds. This ongoing pattern of conduct also gives rise to the appearance of 'cronyism' and 'judge shopping' ".

Judge Laster did not create an atmosphere in which Goldfarb could continue to bring to him old bonds; rather, the Recorder's Court itself, in its informal practices and unclear rules, created this atmosphere. Judge Laster did no more than adhere to his judicial philosophy. For a judge to fail to do his duty as he sees it because others might perceive the appearance of impropriety in such actions might itself be improper.

The Court, unable to say that Judge Laster violated any statute or rule, points to certain aspects of his activities. We are told that Judge Laster remitted other judges' bonds on a wholesale basis on Sundays without the prior knowledge of the prosecutor and that, with rare exception, no judges other than Judge Laster and suspended Judge Del Rio remitted bonds more than three years after forfeiture.

With respect to the number of bonds remitted at one time, if it was proper to remit 1 bond it was

proper to remit 20. The characterization, persistent violation, implies that Judge Laster continued to act after his conduct had been questioned; that is not what occurred. Judge Laster acted on six occasions extending over a 31-month period without suggestion that his actions were improper.

The Master found that Judge Laster was advised by former presiding judges of Recorder's Court that he had the power to remit bonds forfeited by other judges. The statute can fairly be so read. Nor does the statute require that the remittance be issued by the forfeiting judge. This Court reprimands Judge Laster for doing what the statutes and rules do not forbid and what other judges have done.

It was Judge Laster's duty to sit on certain Sundays, and one of his responsibilities then was miscellaneous matters. Judge Laster considered bond remittance a miscellaneous matter, as did late Presiding Judges Murphy and Leonard. Still, the Court finds fault with his so acting on Sundays. Twenty bonds were remitted on days other than Sunday; it cannot be inferred that remittances were ordered on Sunday to hide what was occurring.

Unsure whether bonds can be legally remitted more than one year after forfeiture, the Court points out that "suspended Judge Del Rio" also remitted old bonds. To reprimand Judge Laster because he performed a judicial act which Judge Del Rio also performed, an act not found to be improper, is not appropriate.

Judge Laster's granting the petitions without prior notice may, at first glance, seem suspicious. The implication would be that he was attempting to hide his activity. The record, however, disproves this hypothesis. In granting the motions, Judge

Laster's actions were appropriate to *ex parte* proceedings. He acted in open court, and required a petition stating under oath that all the conditions necessary for bond remission were satisfied. He relied on the sworn statement, issued the order, and gave instructions that the prosecutor receive a copy so that his office could inform the Court of any objections to the remission.[8]

The undisputed testimony is that the Recorder's Court was a "court of an informal nature" and the court rules were "loosely interpreted". In his 17 years with the prosecutor's office, Judge Laster had never heard of that office being notified of presentment of petitions for remittance. The Commission did not even allege that any other judge required prior notice of remittance petitions to the prosecuting attorney. Judge Laster should not be reprimanded for adhering to the practices of the court.

### III

On what basis, then, does the Court discipline Judge Laster? He is disciplined because, although he has committed no impropriety, he has not successfully avoided all appearances of impropriety.

Canon 2 of the Code of Judicial Conduct provides, "A judge should avoid impropriety and the appearance of impropriety in all his activities." We do not question that this canon rightly calls upon the judge to act properly and avoid the appearance of improper action. Rather, we take issue with the notion that a judge can be disci-

---

[8] Charles Goldfarb was the leading Recorder's Court bail bondsman. If any of the petitions had been false or inaccurate the moneys remitted could have been readily recovered from him.

plined for seemingly improper conduct which, upon examination, turns out to be not improper.

The Court disciplines Judge Laster pursuant to GCR 1963, 932.4 which provides:

"(d) Conduct in violation of the code of judicial conduct or code of professional responsibility and canons * * * may constitute misconduct in office or conduct that is clearly prejudicial to the administration of justice * * * . The question in every case is whether the conduct complained of constitutes misconduct in office or conduct that is clearly prejudicial to the administration of justice * * * , not whether a particular canon or disciplinary rule has been violated. All the circumstances are to be considered in deciding whether action by the commission is warranted."

We believe that this section requires more of this Court than its conclusory statement that Judge Laster's conduct "gave the 'appearance of impropriety' and was thus 'clearly prejudicial to the administration of justice' ".

We are unable to see how Judge Laster's actions were "clearly prejudicial to the administration of justice". We are also unable to understand how the Court concludes that disciplinary action is justified in view of all the circumstances, particularly the circumstance that Judge Laster's conduct conformed to a reasonable, good-faith construction of the statutes and court rules and the practices of the Recorder's Court for the City of Detroit.

KAVANAGH, C.J., concurred with LEVIN, J.