Cavanagh, J.
(dissenting). With its decision in this case, this Court departs from thirty-three years of precedent to assert that it has the constitutional authority to impose a level of discipline that exceeds the discipline recommended by the Judicial Tenure Commission. It does so in a matter that the jtc has . twice considered and in which twice a unanimous jtc and the respondent Judge Hathaway have agreed on the *698 appropriate level of discipline. I do not believe that this Court has the constitutional authority to increase the discipline recommended by the JTC and, accordingly, I must respectfully dissent.
i
As our deliberations in these cases have invariably demonstrated, our views of what is appropriate and “proportionate” discipline vary greatly. The final level of discipline imposed quite often is a negotiated level on which at least a majority of this Court can agree. I have no reason to doubt that the decisional process for the JTC works similarly. Any recommendation emanating from that body, more often an amalgam of its members opinions, is a subjective view. Because the JTC has the experience of dealing with these matters routinely, I have usually felt great reluctance in replacing the jtc’s determination of an appropriate discipline with my own subjective view. On some occasions, I have joined this Court’s rejection of recommended discipline as inadequate. See, e.g., In re Griffin, 448 NW2d 352 (1989). However, in each instance of this Court finding the recommended discipline inadequate, it has returned the matter to the JTC for reconsideration and the possibility of a new recommendation. With its decision in this case, though, a majority of this Court rejects the jtc’s twice-offered, unanimous recommendation, and sua sponte raises the level of discipline imposed. In doing so, it also raises the stakes and alters the historically understood dynamic in judicial discipline proceedings.
*699 A. THE SUPREME COURT’S AUTHORITY TO INCREASE DISCIPLINE
Before addressing the now-dynamited dynamic, though, I must address the majority’s error in concluding that this Court even has the authority to increase the level of discipline recommended by the JTC. The JTC was created by the Michigan Constitution, and this Court’s authority over judicial discipline is granted by that document as well. Our authority, however, is limited:
On recommendation of the judicial tenure commission, the supreme court may censure, suspend with or without salary, retire or remove a judge for conviction of a felony, physical or mental disability which prevents the performance of judicial duties, misconduct in office, persistent failure to perform his duties, habitual intemperance or conduct that is clearly prejudicial to the administration of justice. The supreme court shall make rules implementing this section and providing for confidentiality and privilege of proceedings. [Const 1963, art 6, § 30(2).]
The majority concludes that this provision gives this Court the authority to increase the level of discipline recommended by the JTC. It observes that this Court may “censure, suspend with or without pay, retire or remove” a judge. See ante at 684, quoting Const 1963, art 6, § 30(2). However, I cannot agree with that conclusion because it does not account for the common understanding of the constitution.
When interpreting constitutional provisions, this Court applies the rule of common understanding, first articulated by Justice Cooley. Any such analysis is conspicuously absent from the majority opinion, but under this rule, we interpret the constitution to have the meaning most obvious to the common under *700 standing, which is the meaning reasonable minds, the great mass of the people, would give it. See Traverse City Sch Dist v Attorney General, 384 Mich 390, 405; 185 NW2d 9 (1971). The most obvious sense of the constitution is that this Court may impose the levels of discipline mentioned, but that it may only do so “[o]n recommendation of the judicial tenure commission . . . .” This phrase introduces this Court’s power in judicial discipline cases, and conditions any exercise of this Court’s authority on that exercise first having been recommended by the jtc. If the JTC has not recommended to this Court that the Court exercise its authority to impose a certain penalty, then any such exercise by definition cannot be “on recommendation” of the jtc. This Court’s actions in judicial discipline cases that are not “on recommendation” of the JTC are actions in the first instance, and are not authorized by the constitution. Rather, they are an assertion of plenary power over judicial discipline cases.
This exercise of plenary power is contrary to this Court’s demonstrated understanding of its proper role in judicial discipline cases. For example, In re Mikesell, 396 Mich 517; 243 NW2d 86 (1976), held that § 30(2) authorizes this Court to act in judicial discipline cases only on the jtc’s recommendations. In Mikesell, the jtc filed a complaint against the respondent judge, alleging twelve instances of misconduct. However, only five of the twelve allegations survived the initial proceedings and were recommended to this Court as bases for discipline. One of the issues this Court had to decide was whether it could consider all twelve allegations, or only those five that survived the jtc’s review. The Court concluded that the allegations *701 upon which the JTC had not relied were “not part of the recommendation of the Commission and [would] not be considered by this Court.” Id. at 526. Thus, Mikesell held that in judicial discipline cases, this Court is limited to acting on recommendation of the JTC, and matters beyond the jtc’s recommendation are not to be considered by the Court.[1]
Despite the Court being restricted to acting “on recommendation” of the jtc, a majority of this Court imposes discipline on respondent that is beyond the jtc’s recommendation. The jtc recommended that respondent receive a thirty-day suspension, but the Court has gone well beyond that recommendation to impose a six-month suspension. Like the bases of discipline that were not recommended and could not be considered in Mikesell, the six-month suspension the Court imposes on respondent was not recommended to this Court, so this Court lacks the constitutional *702 authorization to consider such discipline, let alone the authorization to impose it on respondent. If the Court is unhappy with the jtc’s recommendation, it should follow our longstanding practice and remand the case to the jtc, rather than assert its own power to act beyond the jtc’s recommendation.
Because the constitution limits this Court to the discipline recommended by the jtc, I also cannot agree with the majority’s inteipretation of MCR 9.225. That rule, which provides that this Court may “modify” the jtc’s recommendations, must be read to conform to the Constitution. As we stated in Grievance Administrator v Underwood, 462 Mich 188, 193; 612 NW2d 116 (2000), the court rules are inteipreted under the principles of statutory construction, which require us to read the court rules in a manner that does not conflict with the Constitution. See People v McLeod, 407 Mich 632, 657; 288 MW2d 909 (1980). Thus, the court rule’s provision that we may “modify” the jtc’s recommendations can only mean that this Court may modify them as long as it stays within the recommendations. It cannot mean that this Court may “modify” a recommendation to do something that the JTC has not recommended in the first place. Doing so is not modifying a recommendation for action, but is taking a greater action despite the recommendation. Such a meaning and the actions pursuant to it, conflict with the constitutional requirement that this Court can only act “on recommendation” of the JTC.[2]
*703 The majority seems to understand me to first “deconstruct” and “torture” the term “modify,” and then urge that the constitutional language “on recommendation” conditions this Court’s power in judicial discipline cases. See ante at 694. This understanding is quite backward. As explained above, the “on recommendation” language from art 6, § 30(2) limits this Court’s power. Because of that limit, we must interpret the term “modify” consistent with the constitution, which means interpreting it to mean that this Court cannot exceed the jtc recommendations in imposing discipline. If interpreting a term in the court rules consistent with the constitution is a “tortured” *704 reading of the term, then this Court must be the Torquemada of text, because we interpret such terms as consistent with the constitution as frequently as necessary because it is our duty. See McLeod, supra at 657; see also Singer, 2A Statutes & Statutory Construction (6th ed), § 45.11, pp 70-71. If adhering to this canon of construction is torturing a word, then we all must be prepared to occasionally inflict forty lashes.
Beyond this, I find perplexing the majority’s other pontifications on restricting the term “modify” to conform to the constitutional requirements. See ante at 685-686, n 10. The majority sees no indication that the term “modify” only allows the Court to operate within the jtc’s recommendations, but that indication is the constitution, which restricts this Court to the jtc recommendations. Further, the majority suggests that, absent the expansive understanding of “modify,” which is only possible once the constitutional limitation that this Court may act only on the jtc’s recommendation is discarded, this Court would be unable to review jtc decisions, and would not operate under the “rule of law.” For thirty-three years, however, this Court has successfully reviewed JTC actions, and has issued written opinions and judgments in accord with its review without exercising the power to sua sponte increase the discipline imposed on respondent judges. During that time, rather than act in the first instance, if our review of jtc decisions had left us dissatisfied, we indicated that the proposed discipline was inappropriate and remanded such decisions to the jtc for further consideration. See, e.g., In re Griffin; In re Lawrence, 419 Mich 1212 (1984). Our practice of conforming to the constitutional language and remanding *705 to the JTC in no way hindered our ability to review JTC decisions. In carrying out our review, we simply gave the jtc an opportunity to come to a satisfactory decision before this Court reviewed the matter again. Because this Court’s longstanding practice fully effectuated its duty to review jtc decisions, the majority’s apparent conclusion that for the past thirty-three years, this Court and the JTC have been operating outside of the rule of law is at best hyperbole, and disrespects this Court itself.
Overstated as well are the majority’s protestations that my position is contrary to the central organizing principle of constitutional government. The majority asserts that under my view, the jtc is not accountable to any elected body, and that the jtc, therefore, could act inappropriately and no elected body could do a thing about it. See ante at 693. These assertions are simply not true. Under my view, the JTC remains accountable to this Court, which is in turn accountable to the people of Michigan. Jtc recommendations must be approved by this Court, and if we think the recommended discipline is not sufficient, we can direct the jtc to consider the matter further. Thus, if the jtc acts inappropriately, we can do a thing about it, the same thing we have done for years. For those years, and under the constitutional condition that our actions must be “on recommendation” of the jtc, accountability has not been a problem, and continuing as we have been is in no way a threat to our constitutional order.[3]
*706 Thus, I cannot agree that this Court may impose greater discipline on respondent than the jtc recommended because the constitution only allows this Court to take those actions that the jtc has recommended. Rather than imposing a harsher sanction itself, if the Court believes that the jtc’s recommended discipline is insufficient, it should remand the case to the jtc to formulate a more severe sanction, as we have done in the past. In the instant case, though, such a remand would be odd, because respondent had agreed to accept the jtc’s recommendation, and did not petition this Court to modify that recommendation. Cases like the instant case illustrate that the majority’s misreading of the constitution will cause unfortunate consequences in judicial discipline proceedings.
B. THE NEGATIVE CONSEQUENCES OF SUA SPONTE INCREASING DISCIPLINE
By departing from the constitutional restriction that this Court must act only on recommendation by the JTC, the decision in this case will set in motion unfortunate consequences in judicial discipline cases. It is important in this case that respondent has not petitioned this Court to modify the jtc’s recommended discipline. Rather, she indicated her willingness to accept the thirty-day suspension the jtc recommended. In fact, respondent only became “adverse” to the jtc in this Court when this Court declined to adopt the recommendation and ordered the parties to argue whether the thirty-day suspension was appropriate, inherently ordering them to address this Court’s authority to sua sponte increase discipline beyond the jtc’s recommendation. See 463 Mich 1201 *707 (2000). Thus, the dispute over how this Court may “modify” the jtc’s recommendations comes not at respondent’s urging, and not at the jtc’s either, which recommended the thirty-day suspension, but only upon the majority of this Court’s own interest in deciding a question that the parties had not actually presented.
In any event, previously, when a judge consented to the jtc’s recommended discipline and did not petition this Court to modify the jtc’s recommendation, this Court has entered the recommended discipline. See, e.g., In re Waterman, 461 Mich 1207 (1999); In re Milhouse, 461 Mich 1279 (2000). However, after this decision, respondent judges would be well advised to consent to nothing and run the entire gauntlet of available proceedings because whatever the discipline recommended by the jtc, this Court is lurking at the end of the line to increase that discipline if it so chooses. A respondent judge’s consent, then, would be futile, as this Court may turn a recommended censure into a suspension, or a suspension into removal, regardless of the respondent judge’s willingness to acknowledge an ethical breach and submit to the discipline the expert body, the jtc, has recommended.
Instead of relying on the jtc’s expertise, though, the majority has decided that this Court would do better to take these matters into its own hands. The benefits of a negotiated and relatively amicable resolution between the jtc and the respondent judge, avoiding the hearings and attendant publicity that contested allegations entail, and thus avoiding unnecessarily promoting the appearance of impropriety guarded against by Canon 2A of the Code of Judicial Conduct, are lost when judges must contest every case or be *708 subject to a sanction that, before this Court issues the final word in a discipline case, is unforeseen. Also lost are the benefits of a judge acknowledging before the JTC and the public that he has done wrong and voluntarily is taking steps to correct the problem. Instead, the new practice of increasing discipline beyond the JTC recommendations encourages respondent judges to fight alleged misconduct to the bitter end because the final sanction that might be imposed in the end would be unknown until this Court imposed it, when it would be too late for a respondent judge to have any input or review of that sanction.[4] Even if the Court’s decision did not contravene the constitution, I would not be able to join a decision that encourages such practices.
C. THE RUNCO DISSENT
Oscar Wilde once wrote that “[Consistency is the last refuge of the unimaginative.”[5] If Wilde was correct, then the majority is apparently attempting to flatter me by complimenting my imaginativeness when it asserts that my dissent from In re Runco, 463 Mich 517; 620 NW2d 844 (2001), is not consistent with my view in the instant dissent. However, I must decline this compliment because my Runco dissent is not inconsistent with my present position, as the majority claims.
*709 In Runco, this Court entered the discipline recommended by the jtc. I did not agree with the recommendation, thinking it was insufficient and preferring the JTC minority position. See id. at 524. As a constitutional matter, before my preferred discipline could have been imposed, the appropriate action would have been for the Court to have remanded to the jtc for further consideration, as we have done in the past. See, e.g., Griffin, supra. However, because six members of this Court did not agree with me, the Court adopted the recommendation and the case was resolved. The final decision was made, and no remand was considered. Thus, because this Court was unanimous in concluding that respondent Runco deserved some level of discipline, and because the case was going to be resolved, my dissent simply stated the discipline that I believed would have been appropriate for the jtc to recommend. For me to have stated that I would have remanded would have been futile; instead, I went on record with my substantive position. My Runco dissent, then, is consistent with the instant dissent, and I am not so imaginative as the majority seems to believe.
Quite imaginative, however, is the majority’s idea that my voting habits are relevant to our disagreement over the meaning of art 6, § 30(2). Though the majority and I may dispute the meaning of that constitutional provision, as explained, my Runco dissent has no effect on this case, so to suggest that my voting habits are hypocritical advances nothing.
n
For the reasons stated, I respectfully dissent from the majority opinion. By misreading the constitution, *710 the majority transforms our judicial discipline system into a system that encourages members of the state judiciary to contest allegations of misconduct and leaves judges in the precarious position of not knowing the upper limit of their potential discipline before that discipline becomes final and irrevocable, except that they may be removed from the bench. I do not believe that the great mass of the people who ratified the constitutional language creating our judicial discipline system intended the system to so operate. Rather, the Michigan Constitution provides for a system that encourages judges to acknowledge and resolve their ethical mistakes. Also, our system allows those judges that do contest their alleged misconduct to arrive at this Court, before it makes a final decision, knowing that the harshest discipline they face is the discipline recommended by the JTC, and knowing that if the recommendation does not suit this Court, it will remand the case to allow the JTC and the respondent judge an opportunity to reach an alternate solution, or at least to allow the respondent judge to know what he faces before this Court makes a final decision. I would remain true to this constitutional design, and therefore I would either accept the JTC’s recommended discipline or reject the recommendation and remand the case to the JTC for further consideration.
Kelly, J., concurred with Cavanagh, J.

 Occasionally, this Court has deviated downward from both the jtc’s recommendations on the bases of discipline and the level of discipline. In Mikesell, for example, the jtc alleged five bases of misconduct and recommended that the respondent judge be removed from office. However, the Court accepted only three of the bases for discipline, and suspended the judge for one and a half years. See Mikesell at 520, 539; 243 NW2d 86 (1976), see also In re Moore, 464 Mich 98; 626 NW2d 374 (2001) (rejecting bases of misconduct and lowering the recommended discipline).
Although these cases represent variations from the jtc’s recommendations, the Court’s actions in them did not go beyond the jtc recommendations. For example, the jtc recommended removal in Mikesell, but the Court ordered a suspension. The suspension was “on recommendation” of the JTC because permanent removal certainly entails one and a half years off the bench. When the Court has ordered less severe discipline than the jtc has recommended, or has not accepted all the bases of misconduct, the Court nevertheless acts “on recommendation” of the jtc because the more severe discipline, or more bases of misconduct, recommended by the jtc necessarily include the lower levels of discipline and the bases of misconduct recommended, but not accepted. Thus, I disagree with the majority’s conclusion that such an action would not be “on recommendation” of the jtc.

 Notably, the majority cites a definition of “modify” that allows it to “alter” the recommendation, and asserts that its authority to increase discipline is “clear.” Ante at 685. Even aside from the constitutional problems with the majority position, the Court’s understanding of the term “modify” is not so “clear.” Rather, “modify” is defined to mean to alter something by making it less extreme, severe, or strong. For example, The American *703 Heritage Dictionary (2d College ed), pp 806-807, defines “modify” to mean:
1. To change in form or character; alter. 2. To make less extreme, severe, or strong. 3. ... To qualify or limit the meaning of . . . 4. ... To change (a vowel) by umlaut ... To be or become modified. [Emphasis added.]
Similarly, Webster’s New International Dictionary of the English Language (2d ed, unabridged), p 1577, indicates that “modify” means to change by lessening:
1. To limit; also, to mitigate, assuage, Obs. 2. To reduce in extent or degree; to moderate; qualify; lower; as, to modify heat, pain, punishment. (He modifies his first severe decree. Drydenj 3. To differentiate into, or diversify by, different forms, as light, sound, passion; — now merged in sense 4. 4. To change somewhat the form or qualities of; to alter somewhat; as, to modify the terms of a contract. 5. Gram. To limit or restrict the meaning of; to qualify. 6. Philol. To change by umlaut. 7. Philos. To determine the, or a particular, mode of. 8. Scots Law. To award a decree as something to be done or paid. — , Intrans.: To undergo or make a modification; change. [Emphasis added.]
The majority is correct that these dictionaries include the definitions they choose. See ante at 685, n 9. Nevertheless, I offer these definitions of “modify” to illustrate the different understandings of the term, in contrast with the majority’s convenient citation of only the definition that supports its conclusion. With these different understandings of “modify,” I can hardly agree that the majority conclusion is “clear.” See ante at 685.

 I find it ironic indeed that the majority invokes the constitutionally safeguarded referendum power as a tool of electoral accountability, yet in MUCC v Sec'y of State (After Remand), 464 Mich 359; 630 NW2d 297 (2001), it subverts the accountability provided by that power.

 The majority discusses respondent’s notice that she faced an increase in discipline, see ante at 696-697, but nevertheless both she, as well as future respondent judges, would not know, beyond the possibility of removal, what the upper limit of their discipline will be until it is upon them. In curious contrast, a convicted felon is at least informed of the upper limit of the possible sentence for his crime.

 The Relation of Dress to Art, quoted in Flesch, ed, The New Book of Unusual Quotations (New York: Harper & Row, 1966), p 62.